USCA1 Opinion

 

 February 22, 1993 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 92-1181 ALBERT J. CADORETTE, ET AL., Plaintiffs, Appellees, v. UNITED STATES OF AMERICA, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Walter Jay Skinner, U.S. District Judge] ___________________ ____________________ Before Breyer, Chief Judge, ___________ Campbell, Senior Circuit Judge, ____________________ and Torruella, Circuit Judge. _____________ ____________________ Jacques B. Gelin, Attorney, Department of Justice, with whom _________________ Barry M. Hartman, Acting Assistant Attorney General, A. John ___________________ ________ Pappalardo, United States Attorney, George B. Henderson, II, Assistant __________ _______________________ United States Attorney, and David C. Shilton, Attorney, Department of ________________ Justice, were on brief for United States. John D. Hallisey for appellee Jean Stevenson Clark. ________________ Arthur C. Croce for appellees Roger Treat Jackson, Jr., Margery ________________ Jackson Chambers, Barbara Jackson Allgeier, and Betsey Jackson Patterson. ____________________ ____________________ [NOTE FROM SYSTEMS: APPENDIX I is not available on the EDOS publication of this opinion.] BREYER, Chief Judge. In 1972 the United States ____________ bought eight acres of land in Truro, Massachusetts, to add to the Cape Cod National Seashore. Unfortunately, the seller, Elizabeth Freeman, owned only a small percentage share of the eight acres that she purported to convey. Elizabeth's long-lived great-grandfather, Edmund Freeman, (whom we shall call "Edmund the Elder") had owned 100% of the eight acres when he died in 1870, but, after his death, the property descended, through inheritance, to many different children, grandchildren, and great-grandchildren, each of whom obtained title to various small percentage interests. In 1984, plaintiff Jean Stevenson Clark brought this action against the Government to "quiet title" to what she said was her percentage share in the property -- a share she claimed to have obtained from the grandchild of one of Elizabeth's aunts. 28 U.S.C. 2409a(a) ("The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest"). Five years later four grandchildren of a different aunt intervened in the lawsuit in order to assert similar claims of ownership. Eventually, the district court entered a judgment that tried to sort out precisely who owned what, and set the compensation that plaintiff and intervenors must receive should the Government decide to keep their interests in the property. 28 U.S.C. 2409a(b) ("if the final determination [of the plaintiff's 'quiet title' action] shall be adverse to the United States, the United States nevertheless may retain such possession or control of the real property or of any part thereof as it may elect, upon payment [of just compensation] to the person . . . entitled thereto"). The Government now appeals this judgment, arguing primarily that the district court did not properly interpret or apply the Massachusetts law of descent and distribution. After the United States took this appeal, it filed a complaint in condemnation, pursuant to 40 U.S.C. 257, against the same property. United States v. 8.0 Acres of _____________ ____________ Land, No. 92-12663S (D. Mass. filed Nov. 5, 1992). When ____ that condemnation is completed, the Government will take whatever interests in the eight acres it does not already own. Because the basic question in a "quiet title" action is "who owns the land," and because condemnation definitively answers this question for the future (i.e., "the United States does"), we have had to consider whether -3- 3 (or the extent to which) the condemnation action has "mooted" this "quiet title" proceeding. We find that the district court correctly allocated certain of the interests in dispute (those inherited through ancestors named "Charles" and "Richard Sr."), but that it improperly distributed certain other interests (those derived from ancestors named "Betsey I" and "Edmund II"). We also decide that the condemnation action "moots" any further judicial efforts to allocate the "Betsey I" and "Edmund II" shares in this "quiet title" proceeding. Instead, the district court shall decide afresh who is entitled to compensation for the "Betsey I" and "Edmund II" shares in the context of the condemnation action now pending before it. I. Background __________ With the help of a diagram (see Appendix I) and ___ the facts as revealed by the record on appeal, we shall retrace the parties' contested claims and the district court's determination of them. We begin with Elizabeth's great-grandfather, Edmund "the Elder" Freeman, who was born in 1780, and who died intestate in 1870. At Edmund the -4- 4 Elder's death each of his three surviving children, and his grandchildren by a fourth child, received an undivided 25% interest in the eight acres. We shall refer to these four siblings as (1) "Charles," (2) "Betsey I," (3) "Edmund II," and (4) "Richard Sr." The youngest of these siblings, Richard Sr. (Elizabeth's grandfather), died in 1886. He left his 25% interest to his five surviving children, Richard Jr. (Elizabeth's father) and her four aunts. Each of these five thereby obtained an undivided 5% interest in the property. When Richard Jr. died in 1940, he left his 5% interest to his daughters Elizabeth and Catherine, 2.5% to each. Catherine (wife of the famous Admiral Nimetz) subsequently conveyed to Elizabeth her vested 2.5% interest (and, the court found, any inchoate interests as well). Thus, Elizabeth, at the time she purported to convey the eight acres to the United States in 1972, undoubtedly owned at least a 5% share. But did she own any more, and if so, how much? The "quiet title" action sought to answer this question. To do so, the court had to decide: (1) What happened to the remaining 20% of Richard Sr.'s 25% share? _________ (2) What happened to the other 75% interest in the land -5- 5 originally inherited by Richard Sr.'s three siblings -- Charles, Betsey I, and Edmund II -- 25% to each? -6- 6 A. Richard Sr.'s 25% Share _______________________ The district court had considerable genealogical information about the line of Richard Sr. As we have said, Richard Sr. was survived by five children, namely, Richard Jr. (Elizabeth's father), and Elizabeth's four aunts, whom we shall call, "Betsey II," "Ellen," "Clara," and "Ada." As we have also said, Elizabeth obtained her father's 5%. The district court found that the remaining 20% (initially belonging to the aunts) descended and devised through various routes, some parts eventually coming to Elizabeth, other parts ending up in the hands of plaintiff Jean Stevenson Clark (who took her interest from Clara's grandchild, Phoebe), and still other parts ending up in the hands of the intervenors, who are Ada's grandchildren. No one contests this division (which is reflected in Appendix II) in this appeal. It is therefore final, and we need not discuss these interests further. B. Charles' 25% Share __________________ We turn next to the 25% interest ascribed to Charles. Charles died in 1868, two years before the death -7- 7 of his father, Edmund the Elder, in 1870. Upon Edmund the Elder's death, Charles' children inherited the 25% that would have gone to Charles, had he outlived his father. See Mass. Gen. L. ch. 190, 3(1) (When an intestate dies seized of land, such land descends "[i]n equal shares to his children and to the issue of any deceased child by right of representation"). Charles' daughter Nancy inherited this entire interest, as she was Charles' last surviving child, and her siblings apparently died without issue. Nancy died in 1931, without any surviving children. At that time Richard Jr., who was Nancy's first cousin (and Elizabeth's father), became the administrator of Nancy's estate. He told the probate court that Nancy's next of kin were three surviving first cousins, namely himself and two of his sisters, Betsey II and Ada. He added that Nancy had several living cousins in the next generation (i.e., in Elizabeth's ____ generation), namely, several of Edmund II's grandchildren. _____ The probate court subsequently distributed Nancy's estate (including the 25% interest inherited through her father Charles) equally to Nancy's living cousins in her own ________ generation, namely Richard Jr., Betsey II, and Ada. It thus awarded each of them an additional 8.33% interest in the property. -8- 8 The district court in this case accepted the 1931 judgment of the Massachusetts probate court as determinative, and factored this information into the chain of conveyances and devolutions. (See Appendix II). The ___ United States, through Elizabeth, received her father's 8.33% interest plus some of both Betsey II's and Ada's shares. The intervenors received the rest of Ada's 8.33% interest, as well as some of Betsey II's share. Jean Stevenson Clark received the tiny remainder of Betsey II's share. The United States, though not arguing the matter at any length, seems to contest this division. C. The 25% Share of Betsey I and the 25% Share of Edmund II ________________________________________________________ The district court had very little information about what happened to the lines of Edmund the Elder's other two children, Betsey I and Edmund II, each of whom inherited a 25% interest in the eight acres. It knew that Edmund II was born in 18ll and that he had seven children. The court also knew that Betsey I died in 1895, that she had ten children, and that she was survived at her death by two of her children and eleven grandchildren. Finally, it had the 1931 probate court record of Nancy's estate, which suggests -9- 9 that some of Edmund II's grandchildren (who were members of Elizabeth's generation) were still alive in 1931. The upshot is that the district court had evidence of the existence of twelve or more grandchildren of Betsey I and Edmund II, as of 1895 (eleven of Betsey I's grandchildren) and 1931 (an undetermined number of Edmund II's grandchildren). These individuals, like Elizabeth, were great-grandchildren of Edmund the Elder. Their descendants (if they exist) might be entitled to a 50% share of the property. But, one of the intervenors told the court, no one now knows anything about them. Knowing no more than this, the district court faced three main possibilities. First, Betsey I and Edmund II might have descendants still alive. If so, then these surviving descendants would own (subject to any further transactions) their ancestors' 50% interest in the eight acres. Second, both lines may have died out, but only after Elizabeth died in 1977. In that case, any descendants _____ of Edmund the Elder's two other heirs (namely, Charles and Richard Sr.) still alive as of 1977 might have inherited their interests (in the absence of such complicating features as, say, wills). See Mass. Gen. L. ch. 190, 3(6) ___ -10- 10 (when an intestate dies seized of land and "leaves no issue, and no father, mother, brother or sister, and no issue of any deceased brother or sister, then [his estate descends] to his next of kin in equal degree"). According to the district court's uncontested findings, the only descendants of Charles or Richard Sr. to survive Elizabeth were her sister Catherine and her aunt Ada's grandchildren, Richard Sr.'s great-grandchildren, namely, the intervenors. (Since Catherine had conveyed her inchoate interests in the property to Elizabeth back in 1941, she was not eligible to inherit, even though she outlived Elizabeth by two years.) On this hypothesis, therefore, Betsey I and Edmund II's 50% share would have devolved to the intervenors. Third, Betsey I and Edmund II's lines may have died out before Elizabeth's death in 1977. In that case, to ______ determine who obtained their interests (even if we assume no wills) is yet more complex, for it would depend upon just when they died and which members of their generation (descended from Edmund the Elder) were alive at that time. Mass. Gen. L. ch. 190, 3(6) ("if there are two or more collateral kindred in equal degree claiming [entitlement to intestate next of kin's land] through different ancestors, those claiming through the nearest ancestor shall be -11- 11 preferred to those claiming through an ancestor more remote"). The district court, choosing the second possibility, concluded that the two lines died out after _____ Elizabeth's death in 1977. It then awarded the entire 50% to the intervenors, dividing it equally among the four of them. The Government's appeal focuses primarily upon this determination, which, the Government contends, incorrectly applies Massachusetts' law of descent and distribution. II. The Legal Merits ________________ As we have said, the United States contests the way in which the district court allocated ownership of the "Charles" line's 25% share, the "Betsey I" line's 25% share, and the "Edmund II" line's 25% share. We do not understand the basis for its claim of error in respect to the first of these matters, a claim that it treats cursorily in its brief. In 1931 a Massachusetts probate court decided that this share belonged to Richard Sr.'s then-living children, namely Richard Jr. (Elizabeth's father), Betsey II, and Ada. It gave each of them one-third of the share. Ordinarily a -12- 12 federal court will (indeed, must) accept such final state court awards as legally binding. See 28 U.S.C. 1738 ___ ("judicial proceedings . . . of any court of any State . . . shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State"). Cf. U.S. Const. art. IV, 1 __ ("Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State."). We are aware of no special reason here for departing from this general rule. Consequently, we affirm the district court's distribution of this 25% share. We do not believe, however, that the district court's awards of the other two 25% shares were legally correct. To reach its conclusions the court had to find (1) that all the descendants of Betsey I and Edmund II had died out by 1984, but (2) that some such descendants were alive as of Elizabeth's death in 1977. The court had before it a record that reveals no significant effort by anyone to _____________________ search for, or to contact, by publication or otherwise, any descendants of the Betsey I or Edmund II lines. (The court, in fact, rejected the plaintiff's motion for the appointment of a guardian ad litem to do precisely that.) Rather the record contained only: -13- 13 (1) the facts previously mentioned (namely, that Edmund II had grandchildren alive in 1931 and that Betsey I had eleven grandchildren alive in 1895); (2) testimony by one of the intervenors, an "amateur genealogist," that she had no knowledge of any issue of either Betsey I or Edmund II; (3) testimony by a genealogist for the Government who had primarily investigated Richard Sr.'s line __________________ that he had not found evidence of any living descendants of Betsey I or Edmund II. The district court reasoned from this evidence to its conclusions in three steps, with the help of two Massachusetts cases, Butrick v. Tilton, 155 Mass. 461, 29 _______ ______ N.E. 1088 (1892), and Loring v. Steineman, 42 Mass. 204 ______ _________ (1840). First, Butrick involved plaintiffs who claimed _______ that they, rather than a tenant, had title to real property that the tenant occupied. According to the district court, Butrick held that, once the "demandants" prove "their _______ succession to the title," the burden then shifts to the tenant to prove the "existence of other heirs whose title would defeat or reduce the claims of the demandants." The district court reasoned, by analogy, that once the intervenors proved "their succession" to the Betsey I and Edmund II interests, the burden then shifted to the United States to show the "existence of other heirs," namely descendants of those two lines. -14- 14 Second, the district court stated that Loring held ______ (1) that the presumption of continued life persists for no more than seven years after a person is last heard from, at which point a "presumption of death" arises, and (2) that those claiming that a person presumed dead left either spouse or children have the burden of proving it. The district court apparently reasoned that since no one had heard of any descendant of Betsey I since at least 1895, nor of any descendant of Edmund II since at least 1931, that these descendants (alive in 1895 and 1931) were "presumed to have died out." The court also concluded that United States had not proved the existence of any issue. Third, the district court noted that there "is no indication in the file that any attempt to locate the heirs of Betsey [I] or Edmund [II] was made until this action was filed [in 1984]." For this reason, the court concluded that the two lines would be presumed to have died out as of the 1984 filing date, seven years after Elizabeth's death in _____ 1977. We do not believe that these cases warrant the result now before us. For one thing, Butrick involved _______ plaintiffs who established their "succession" to title with at least a little more evidence than was present in this -15- 15 case. The demandants there obtained title from their ancestor, who had allegedly obtained title from relatives (not the children) of a man named Jacob Ayer, who had died in 1789. Jacob Ayer, in turn, inherited his interest from his father. To establish their claim to at least some ownership interest in the property, the plaintiffs had to show that the relatives of Jacob Ayer had had title, which, in turn, required them to show that Jacob Ayer had left no issue. Butrick, 155 Mass. at 465. To establish the full _______ extent of Jacob Ayer's interest in the property, and hence their own, the plaintiffs had to show that Jacob's brother Joseph had died before Jacob died, and without issue. Id. ______ __ at 466. To show the first of these matters, the plaintiffs provided, as a witness, Mrs. Butrick, Jacob Ayer's step great-granddaughter, whom the court held (given her relationship and interests) competent to testify "as to general repute . . . as to matters of pedigree." Id. Mrs. __ Butrick testified that Jacob's second marriage (to her great-grandmother) produced no issue and that she had never heard of any issue from Jacob's first marriage. Id. at 465- __ 66. To show the second of these matters, the plaintiffs submitted (1) the will of Jacob Ayer's father, which -16- 16 mentioned six children, including Jacob, but not his brother Joseph, and (2) "evidence of the unsuccessful inquiry where it was probable that information could be found if Joseph had been living up to 1810," including an examination of headstones and official records in the town where he was born. Id. at 466-67. __ The evidence as to the first of these matters (Jacob's lack of issue) seems at least a little stronger than the comparable evidence here. One can more reasonably be expected to know (as in Butrick) whether one's (step) _______ great-grandfather had children than to know (as here) whether one has third cousins who are still living, i.e., whether one's great-grandfather had brothers or sisters who had children who had children who had children who are now alive. The evidence of the second of these matters (i.e., the extinction of a collateral line with a rival claim) is much stronger in Butrick than here, for it included a _______ serious search, the failure of which had obvious probative value. The record in this case, by contrast, contains no evidence of any significant effort to locate, or to provide notice to, the descendants of Betsey I or Edmund II. Of course, the Massachusetts courts decided Butrick nearly a _______ century ago. But in light of the technological improvements -17- 17 which have made it easier to track down other individuals, we believe Massachusetts courts would insist, if anything, on greater efforts to locate missing owners, rather than _______ needlessly tolerate lesser efforts. ______ We are also uncertain about whether, or just how, Loring applies here, say, to Edmund II's grandchildren. ______ Loring involved a man who departed from where he lived, went ______ off to sea, and who was never heard of again by his family and those in his native town. Loring, 42 Mass. at 206. ______ Edmund II's grandchildren do not seem quite like the missing sailor, however, for there is no reason to believe that those with whom they lived never "heard of" them after 1931. See Knapp v. Graham, 320 Mass. 50, 54 (1946) (rival heir ___ _____ ______ will not be presumed dead where no proof of actual death or unexplained absence from domicil or established residence for more than seven years). The only reason we have not __ heard of them again, as far as the record reveals, is that no one has attempted to look for them. Regardless, we do not see how Loring (whether or ______ not taken together with Butrick) could justify the district _______ court's conclusion that the two lines died out after 1977. __________ If we accept, for the sake of argument, that Loring's "seven ______ year" presumption applies, then we would have to presume -18- 18 that Betsey I's grandchildren were no longer living seven years after 1895, when, according to the record, their existence was last documented. Similarly, we would have to presume that Edmund II's grandchildren were no longer alive seven years after 1931. Were that so (and assuming no issue), the intervenors would not inherit the lost heirs' entire interests, because others (including Richard Jr., the father of Elizabeth, the Government's grantor) were alive in 1902 and/or 1938, and thus entitled to a share. The record is totally silent as to whether Betsey I or Edmund II's grandchildren produced issue. And, we do not understand what rule of law would permit the court to presume both that ____ these grandchildren (and any issue they produced) still existed in 1977 and that they died (without issue) shortly ___ after 1977. For these reasons, we conclude that Massachusetts law, as it applies to the facts before us, does not support the district court's award of 50% of the locus (consisting of Betsey I's 25% interest and Edmund II's 25% interest) to the intervenors. We therefore must vacate the judgment below insofar as it makes that award. We need not further decide precisely how Massachusetts law ought to apply to the -19- 19 existing record because, for reasons set out in Part III below, the relevant facts may change. -20- 20 III. Further Proceedings ___________________ As noted above, the United States has filed, while this appeal was pending before this court, a complaint in condemnation against the eight acres at issue here. After oral argument on appeal, the United States asked us to vacate the judgment below so that the district court, in the condemnation action, can determine compensable ownership interests on a clean slate. We see no basis for vacating the judgment below, however, insofar as that decision makes a final award of interests. The judgment below is obviously _____ "final" with respect to Richard Sr.'s 25% share, for no one has appealed from that award. See Restatement (Second) of ___ ________________________ Judgments, 13 cmt. e ("A judgment may be final in a res _________ judicata sense as to a part of an action [or a claim] although the litigation continues as to the rest"). It is also "final" with respect to Charles' 25% share, for, although the United States has appealed that award, we have found no legal reason to disturb it. See id. at 13 cmt. f ___ __ ("a judgment otherwise final remains so despite the taking of an appeal . . . . finality [not being] affected by the fact that the taking of the appeal [may] prevent[] its execution or enforcement"). And, we do not believe the -21- 21 United States should be able automatically to avoid a district court's "quiet title" judgment with which it disagrees simply by appealing it and filing a condemnation petition in the interim. Here, it seems both fair and potentially expeditious for the district court's "quiet title" allocation of Charles's share to govern the condemnation action's compensation decisions (as they will in the case of Richard Sr.'s share). See id. at 27 ___ __ (setting forth the basic principle of collateral estoppel). Since we vacate the judgment below in respect to the rest of the "quiet title" action, which concerns the distribution of the Betsey I and Edmund II shares, there is no final judgment in effect regarding those shares. And ______________ because we find that condemnation will eliminate the requisite controversy as to who owns the Betsey I and Edmund II shares, we order the district court to dismiss the complaint in respect to the vacated portions as "moot." The district court should determine afresh whom to compensate for those shares in the context of the separate condemnation action. Because we have found authority from a sister circuit that casts doubt upon our finding of partial mootness, and because the plaintiff and intervenors oppose vacatur, we shall explain our reasoning in some detail. -22- 22 At the outset, one must understand a few of the technical differences between a "quiet title" action and a "condemnation" proceeding. A condemnation action is brought by the Government and proceeds in rem against the property ______ itself. See United States v. Carmack, 329 U.S. 230, 235 n.2 ___ _____________ _______ (1946). As an exercise of eminent domain, condemnation "extinguishes all previous rights," Duckett & Co. v. United _____________ ______ States, 266 U.S. 149, 151 (1924), and gives the United ______ States title to the entire condemned property "good against the world." Norman Lumber Co. v. United States, 223 F.2d __________________ ______________ 868, 870 (4th Cir.), cert. denied, 350 U.S. 902 (1955). _____________ Condemnation secures better title, in fact, than may be obtained through voluntary conveyance. See Carmack, 329 ___ _______ U.S. at 239. The title to the property vests in the United States when the award of "just compensation" has been ascertained and paid. See Albert Hanson Lumber Co. v. ___ __________________________ United States, 261 U.S. 581, 587 (1923); United States v. ______________ _____________ 341.45 Acres of Land, 751 F.2d 924, 926 n.2 (8th Cir. 1984) ____________________ (where Government files a complaint in condemnation, title passes when compensation award paid into district court). Upon receipt of the award, the district court will distribute it among those who owned the property at the time of condemnation. See Fed. R. Civ. P. 71A(j). ___ -23- 23 In an action under the Quiet Title Act, by contrast, a private plaintiff names the United States "as a party defendant . . . to adjudicate a disputed title to real property in which the United States claims an interest . . . ." 28 U.S.C. 2409a(a). If the plaintiff prevails, he can recover the land wrongly held by the United States. The Quiet Title Act also permits the Government to retain property it does not own, but only after a court has reached _____ a "final determination" in the title dispute "adverse to the United States." Id. at 2409a(b). At that point, the __ United States can elect to keep the prevailing plaintiff's interest in the land by paying him "just compensation" for it. Id. Yet even if the United States acquires the __ plaintiff's interest, it will nonetheless be potentially liable to third parties not joined in the action, who may have better title than either the plaintiff or the Government. See, e.g., Younce v. United States, 661 F. Supp ___ ____ ______ _____________ 482, 487-88 (W.D.N.C. 1987) (judgment for Government in 2409a lawsuit means that United States holds title superior to plaintiffs, but not necessarily good title as against the world), aff'd, 856 F.2d 188 (4th Cir. 1988); Oneida Indian _____ _____________ Nation v. New York, 732 F.2d 261, 265 (2nd. Cir. 1984) ______ ________ ("Ordinarily a judgment in a[] . . . quiet title action will -24- 24 not affect the interests of others than the parties or those in privity with them."). This is because a "quiet title" action is, generally speaking, an in personam proceeding, __ ________ see Nevada v. United States, 463 U.S. 110, 143-44 (1983), ___ ______ _____________ the purpose of which is to determine which named party has superior claim to a certain piece of property. See 74 C.J.S. ___ Quieting Title 1, at 11 (1951). But see id. 7, at 18 & ______________ ________ __ Supp. 1992 (scattered authority for proposition that "quiet title" action can operate in rem or quasi in rem). ______ ____________ Keeping these descriptions of the two actions in mind, one can understand our conclusion that the condemnation proceeding has "mooted" what remains of the "quiet title" controversy (i.e., that portion of the "quiet title" controversy for which no final judgment is in _______________ effect). The Quiet Title Act authorizes only actions that require courts "to adjudicate a disputed title to real ________ property in which the United States claims an interest . . . ." 28 U.S.C. 2409a(a) (emphasis added). The words of the statute, taken literally, permit adjudications only when the title or ownership of real property is in doubt. Cf. __ Ginsberg v. United States, 707 F.2d 91, 93 (4th Cir. 1983) ________ _____________ (landlord cannot maintain 2409a "quiet title" action against United States in dispute over Government's alleged -25- 25 breach of contractual obligations as tenant under lease, since dispute does not cast doubt on the title or ownership of the property). The initial inquiry in any such action must therefore be, "Who holds superior title to the property -- the plaintiff or the United States?" Only if the courts finally resolve the title dispute in a manner "adverse to the United States" (i.e., the plaintiff holds superior title) will they reach a second question, "Does the United States wish to keep the plaintiff's property interest, regardless, by paying just compensation for it?" Once the property has been condemned, however, the "quiet title" court cannot make a "final determination" as to title that is "adverse to the United States." The condemnation gives the United States indefeasible title. Hence, the "quiet title" action's first question -- "Who has superior title?" -- is preclusively determined in the United States' favor. The upshot is that the filing of the condemnation action has eliminated the prerequisite for a "quiet title" action -- a "disputed title" -- and thereby "mooted" its threshold inquiry, "Who owns title?" For this reason, the unresolved portion of this "quiet title" action cannot continue. -26- 26 Strong practical considerations support our technical reading. A condemnation action seems to provide a more effective way than a "quiet title" action to deliver just compensation to those private persons entitled to receive it. "Quiet title" procedures do not automatically provide for the notification of persons not party to the action (e.g., the "lost" descendants of Betsey I and Edmund II) who may have title superior to both plaintiffs and the Government. Thus, the true owners may not receive compensation, and a court, wrongly believing that they do not exist, may order the Government to pay the plaintiffs ___ full compensation, thereby exposing the Government to double liability should the true owners eventually surface and sue. The procedures for condemnation, by contrast, expressly require the Government to take steps to search for "lost" heirs. See Fed. R. Civ. P. 71A(c)(2) ("prior to any ___ hearing involving the compensation to be paid for a piece of [condemned] property, the [condemnor] shall add as defendants all persons having . . . an interest in the property whose names can be ascertained by a reasonably diligent search of the records, . . . and also those whose names have otherwise been learned."). As a result, these -27- 27 procedures tend to compensate those entitled to compensation and to protect the Government from double liability. They also make it less likely that the Government will obtain a windfall, for example, by physically occupying land it does not own, and whose unknown owners never bring a "quiet title" action to obtain payment; the Government must pay the entire value of the condemned property into court, whether or not it has ascertained who owns it. See United States v. ___ _____________ 3276.21 Acres of Land, 194 F. Supp. 297, 300 (S.D. Cal. _______________________ 1961) ("Any contest between persons claiming an interest in the award is heard . . . only after the award for all the interests in the land has been made"). And, the court apparently retains a degree of freedom to divide this compensation (and to condition its distribution) in a manner that seems fair, in light of the possibility that "lost" heirs may eventually appear. See, e.g., United States v. ___ ____ ______________ 550.6 Acres of Land, etc, 68 F. Supp. 151, 154 (D. Ga.) __________________________ ("where neither claimant shows right or title to [the condemnation award], the money should remain subject to the control of the court for disbursement to the proper claimant, when and if he should appear"), aff'd sub nom. _______________ Shropshire v Hicks, 157 F.2d 767 (5th Cir. 1946). Indeed, __________________ courts have held that, where a "true owner" appears after -28- 28 the condemnation award has been distributed, this "true owner" may obtain a proper share from those persons who wrongly received such award. See In re Block bounded by ___ ________________________ Chauncey St., etc., 209 N.Y. 127, 102 N.E. 638, 640 (1913) __________________ (uncompensated true owner of condemned land can bring an action for money had and received against person to whom condemnation award erroneously paid); Palo v. Rogers, 116 ____ ______ Conn. 601, 165 A. 803, 805 (1933) (where city erroneously paid landowner rather than mortgagees for land taken, mortgagees had good cause of action to recover such amount from landowner). These practical considerations seem particularly important in this case, since the more thorough investigation that the condemnation action promises will likely permit an easier resolution of the issues of Massachusetts law. We have found, however, authority from the Fourth Circuit, Fulcher v. United States, 632 F.2d 278 (4th Cir. _______ _____________ 1980) (en banc), followed by the Eighth Circuit, United ______ States v. Herring, 750 F.2d 669, 672 (8th Cir. 1984), that ______ _______ casts doubt upon our "mootness" conclusion. In Fulcher, a _______ plaintiff brought a 2409a action in 1977 to "quiet title" to property which the Government had condemned eighteen -29- 29 years earlier, in 1959, without properly notifying him. A majority of the Fourth Circuit, sitting en banc, held that the 1959 condemnation vested indefeasible title in the Government. Fulcher, 632 F.2d at 284 (plurality); id. at _______ __ 294 (Hall, concurring in part and dissenting in party); id. __ at 295 (Murnaghan, dissenting). Yet a majority also held that the plaintiff could nonetheless maintain a 2409a "quiet title" action in order to obtain just compensation for the Government's appropriation of his property. Id. at __ 285 (plurality); id. at 286 (Phillips, concurring). The __ Circuit reached this result even though the plaintiff could have sought compensation in the Court of Claims (now known as the United States Claims Court) by bringing a takings claim under the Tucker Act. 28 U.S.C. 1491 ("The United States Claims Courts shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon the Constitution"). See Fulcher, 632 F.2d at 295 ___ _______ (Murnaghan dissenting) (arguing that Court of Claims was the appropriate forum for plaintiff's claim). Fulcher's _______ holding, applied to the present case, suggests that the Government's condemnation of the eight acres at issue here does not "moot" the intervenors' remaining "quiet title" claims, or prevent the parties from adjudicating -30- 30 compensation in the context of the "quiet title" action. One might well ask, if Fulcher's plaintiff could bring a _______ post-condemnation "quiet title" action seeking only ____ compensation, how can we say that the condemnation action "moots" further (compensation-seeking) proceedings in the "quiet title" action before us? We could answer that question by pointing to differences between this case and Fulcher. The Fulcher _______ _______ plurality, for example, focused primarily on whether a plaintiff could sue for compensation in a highly convenient, local "quiet title" forum, or would, instead, have to sue for compensation (under the Tucker Act) in the less convenient Court of Claims. Fulcher, 632 F.2d at 282, 285- _______ 86 (plurality). Here, by contrast, the plaintiffs can obtain compensation in the local district court even without the Quiet Title Act, and other practical considerations argue strongly in favor of ending the "quiet title" action and proceeding henceforth in condemnation. The Fulcher plurality also developed a theory that _______ the plaintiff (not properly notified in the earlier condemnation action) had a kind of "equitable lien" enforceable in a later "quiet title" action. Id. at 284-85 __ (plurality). That theory is not applicable here, as the -31- 31 named plaintiffs have all been notified about the condemnation complaint. Rather than distinguish Fulcher on grounds that _______ may further complicate this complex area of law, however, we believe it more straightforward to say that we disagree with its reasoning. At bottom, the Fulcher plurality interpreted _______ the "quiet title" statute as allowing the post-condemnation suit because (1) of policy grounds favoring adjudicating property-related disputes in nearby courts, and (2) its inability to find strong reasons against such an interpretation. Indeed, it wrote that it "perceive[d] neither congressional intent nor principled reason for distinguishing" between "takings" effected without formal _______ condemnation proceedings (which, if made without proper compensation, can give rise to "quiet title" actions by the uncompensated owners for payment) and "takings" arising out _______ of formal condemnation proceedings (which, if made without proper compensation, can give rise to Court of Claims proceedings for payment). Id. at 284 (plurality). __ We do see a crucial distinction, however, between bringing a "quiet title" action where title is still in dispute and bringing a "quiet title" action after the Government has indisputably obtained title through -32- 32 condemnation. This distinction, as we have said, lies in the theory of the "quiet title" suit as an action to adjudicate disputed title, and in the language of the federal "quiet title" statute itself. That statute provides that the Government may retain real property (by paying just compensation) only "if the final determination __________________________ [of the underlying 'quiet title' action] shall be adverse to _______ the United States . . . ." 28 U.S.C. 2409a(b) (emphasis added). Where the United States has indisputably obtained title, it is difficult to see how this condition could be fulfilled. So even though, as the Fulcher plurality stated, _______ the legislative history of the Quiet Title Act "is inconclusive about claims of omitted owners arising out of formal condemnation proceedings," Fulcher, 632 F.2d at 284 _______ (plurality), the language of the statute, and its underlying logic, are not. A second consideration that threatens our conclusion of "mootness" lies in the fact that the Government has not yet paid an amount deemed to be "just compensation" into court. As the case law makes clear, title shifts upon payment of this amount, not before. See ___ Albert Hanson Lumber Co., 261 U.S. at 587; 341.45 Acres of ________________________ ________________ Land, 751 F.2d at 926 n.2. The Government has told us, ____ -33- 33 however, that it intends to proceed with the condemnation action. We surmise that it has held up actual payment pending our decision in this appeal. We shall therefore eliminate this "chicken and egg" problem by conditioning our judgment, insofar as it orders the remanded "quiet title" action to be dismissed, upon the Government's payment of the condemnation award into the district court. IV. The Judgment ____________ 1. The 25% share of Richard Sr. As we previously ____________________________ pointed out, no one has appealed the district court's judgment allocating the 25% undivided interest that originally belonged to Elizabeth's grandfather, Richard Sr. We therefore affirm the judgment below in respect to that share, and direct the district court to order the Government to compensate the parties according to its original determination. 2. The 25% Share of Charles. We also affirm the _________________________ district court's distribution of the 25% share originally inherited through Charles. This distribution, as we have said, simply implemented the Massachusetts probate court's -34- 34 1931 decision allocating this share, a decision whose validity has not been challenged. 3. The 25% Shares of Betsey I and Edmund II, ______________________________________________ Respectively. For the reasons stated above, we vacate the _____________ district court's distribution of the 50% interest initially belonging to Betsey I and Edmund II, and order the district court to dismiss what remains of the original "quiet title" action as "moot" when the Government pays the award into court in the condemnation proceeding. The parties must relitigate their claims to entitlement to compensation for these shares in the condemnation proceeding, in light of any new evidence revealed therein. So Ordered. __________ -35- 35 APPENDIX I is not available on the EDOS publication of opinion 92-1181. -36- 36 APPENDIX II The district court awarded the Richard Sr. and Charles shares, comprising one one-half of the title to the property, as follows: The United States 27.24% Jean Stevenson Clark 3.17% The Intervenors: Barbara Jackson 12.39% The three children of Roger Jackson (Roger Jr., Margery, & Betsey III) 7.23% -37- 37