USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

 
No. 98-2257

 UNITED STATES,
 
 Plaintiff, Appellee,
 
 v.
 
8.0 ACRES OF LAND, MORE OR LESS, SITUATED IN BARNSTABLE COUNTY,
 COMMONWEALTH OF MASSACHUSETTS; RAYMOND W. COBB,
 
 Defendants
 
 
 MARY VIRGINIA BRANDT RUXTON; ESTATE OF JEAN STEVENSON CLARK;
 NORMAN S. ROSE; ELMER Q. ROSE; AUSTIN L. ROSE,
 ESTATE OF PRISCILLA L. ROSE; JOHN D. HALLISEY,
 
 Defendants, Appellees
 
 ROGER TREAT JACKSON, JR.; MARGERY JACKSON CHAMBERS;
 BETSEY JACKSON PATTERSON; BARBARA JACKSON ALLGEIER,
 
 Defendants, Appellants
 
 ARTHUR C. CROCE
 
 Appellant.
 
 
No. 98-2313

 UNITED STATES,

 Plaintiff, Appellee,

 v.
8.0 ACRES OF LAND, MORE OR LESS, SITUATED IN BARNSTABLE COUNTY,
 COMMONWEALTH OF MASSACHUSETTS; RAYMOND W. COBB,
 
 Defendants
 
 MARY VIRGINIA BRANDT RUXTON; ESTATE OF JEAN STEVENSON CLARK;
 NORMAN S. ROSE; ELMER Q. ROSE; AUSTIN L. ROSE; 
 ESTATE OF PRISCILLA L. ROSE; JOHN D. HALLISEY,
 
 Defendants, Appellants
 
 ROGER TREAT JACKSON, JR.; MARGERY JACKSON CHAMBERS;
 BETSEY JACKSON PATTERSON; BARBARA JACKSON ALLGEIER,

 Defendants, Appellees,

 ARTHUR C. CROCE,
 
 Appellee.
 

 APPEALS FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Mark L. Wolf, U.S. District Judge]
 

 Before
 
 Selya, Circuit Judge,
 Cyr, Senior Circuit Judge,
 and Lipez, Circuit Judge.
 
 
 
 
 John D. Hallisey for Mary Virginia Brandt Ruxton et al.
 John T. Stahr, Dept. of Justice, with whom Lois J Schiffer,
Asst. Attorney General, Donald K. Stern, United States Attorney and
George B. Henderson, II, Asst. United States Attorney, John A.
Bryson and Joy Ryan, Attorneys, Dept. of Justice were on brief, for
appellee United States.
 Arthur C. Croce, for Roger Treat Jackson, Jr., et al. and pro
se.

November 30, 1999

 
 
 

 LIPEZ, Circuit Judge. Mary Brandt Ruxton, the estate of
Jean Stevenson Clark, Norman S. Rose, Elmer Q. Rose, Austin L.
Rose, and the estate of Priscilla L. Rose (collectively the "Ruxton
heirs" or "Ruxton claimants") appeal from an order of the United
States District Court for the District of Massachusetts
establishing the interest of several dozen claimants in a
condemnation award. The Ruxton heirs argue that, in addition to
the share awarded to them by the trial court, they are entitled to
claim the interest of absent heirs who did not appear in court and
whose existence, in some cases, cannot be confirmed (the "absent
heirs"). The Ruxton heirs claim that the district court deprived
them of this entitlement by ruling that the unclaimed funds would
escheat to the United States. The Ruxton heirs also argue that the
trial court awarded inadequate attorneys' fees under the common
fund doctrine. Arthur C. Croce, an attorney representing different
claimants in an earlier, related, action, also appeals, asserting
that the trial court erred in concluding that he was not entitled
to attorneys' fees in the instant case. 
 We affirm the district court's order, finding that it did
not escheat funds to the United States and that it properly
apportioned the condemnation award according to largely uncontested
genealogical evidence. Pursuant to that order, the Ruxton heirs
may still claim that they are entitled to collect a portion of the
award reserved for the absent heirs. Their entitlement to the
funds of the absent heirs is, therefore, not yet ripe for our
resolution. We likewise affirm the district court's judgment as to
attorneys' fees. 
 I.
Background
 The instant dispute has a long history, discussed also in
our decision in Cadorette v. United States, 988 F.2d 215 (1st Cir.
1993). Here, we sketch the outlines, focusing on the specifics
relevant to this dispute.
A. The Land Purchase
 In 1972, the United States purchased eight acres of land
in Truro, Massachusetts (the "eight acres") for inclusion in the
Cape Cod National Seashore. Regrettably, the seller of the
property, Elizabeth Freeman, owned only a small fraction of the
land she purported to convey. Elizabeth's great grandfather,
Edmund Freeman (referred to as "Edmund the Elder"), had owned 100
percent of the land when he died intestate in 1870. At his death,
his three surviving children and the direct descendants of his
fourth child each received an undivided twenty-five percent
interest in the property. We shall refer to these four lines as
"Charles," "Betsy I," "Edmund II," and "Richard Sr." These four
twenty-five percent interests continued to descend over the next
century, through more than 100 heirs, most of whom did not know
that they owned an interest in the eight acres.
B. The Quiet Title Action
 The defects in the land sale came to light in 1984, when
Jean Stevenson Clark sued the United States pursuant to 28 U.S.C.
 2409(a) to "quiet title" to what she claimed was her share in the
eight acres. Soon, others intervened in the lawsuit, all claiming
that they too were heirs of Edmund the Elder and thus owned a share
of the property that Elizabeth had sold to the government. The
trial court (Skinner, J.) divided the interests in the property
based on its reading of the Massachusetts law governing descent and
distribution. See Cadorette v. United States, 1990 WL 149979 (No.
84-2428-S) (D. Mass Sept. 18, 1990). The United States appealed,
arguing that the trial court misapplied Massachusetts law. While
the appeal was pending, the United States filed a complaint in
condemnation pursuant to 40 U.S.C. 257, seeking to acquire
whatever interest in the land that it did not own already. 
 On appeal, we concluded that the trial court had properly
distributed the interests of two of the four original heirs to the
eight acres, Charles and Richard Sr. See Cadorette v. United
States, 988 F.2d 215 (1st Cir. 1993). That part of the judgment
was final. But we vacated the trial court's decision to distribute
the interest of the other two original heirs, Betsy I and Edmund
II, solely to those litigants who were presently before it. We
observed that the district court had learned "very little" about
these two lines and that the record contained "no evidence of any
significant effort to locate, or to provide notice to, the
descendants of Betsy I or Edmund II." Id. at 219, 221. Given the
sparsity of information, the district court had inappropriately
presumed that Betsy I and Edmund II's lines had died out, and it
had been particularly inappropriate to presume that they had died
out during the one seven-year period under which the parties before
the court would be entitled, under Massachusetts law, to their
entire interest in the land. See id.
 In Cadorette, we declined to determine "precisely how
Massachusetts law ought to apply" because the government had since
filed a condemnation action. Id. at 222. We ruled that the
initiation of condemnation proceedings mooted the "quiet title"
dispute, and thus displaced any further need for the trial court to
determine the interest of Betsy I and Edmund II in the quiet title
action. By filing a condemnation action, the government would
acquire the fifty percent interest in the eight acres that had
passed through Betsy I and Edmund II upon payment of "just
compensation." See id. at 222-226. We ruled that upon a further
search for heirs of Betsy I and Edmund II, "the district court
should determine afresh whom to compensate for those shares." Id.
at 222.
C. The Condemnation Proceedings
 In the condemnation proceedings that followed our
decision in Cadorette, the parties stipulated that the "just
compensation" for Betsy I and Edmund II's fifty percent interest in
the eight acres was $162,000. The issue turned, once again, to
distribution. The United States presented the findings of its
expert genealogist, George M. Dallas, who had authored a report
tracing the devolution of ownership interests of Betsy I and Edmund
II (the "Dallas Report"). Although Dallas identified some direct
descendants of Betsy I and Edmund II who had inherited an interest
in the property, the information about these lines was still
incomplete. For example, Dallas learned that Betsy I had eleven
children between 1830 and 1854 and that she left her estate to
thirteen children and grandchildren. What became of all of these
heirs, however, was (and is) unknown. For example, the Dallas
Report concluded that the "Heirs of William Edward Sargent" (Betsy
I's grandson) were entitled to a specific share of the eight acres,
but it failed to specify who those heirs were. 
 The Ruxton heirs did not contest Dallas's genealogical
findings. They did, however, file motions arguing that the court
should award them the shares of heirs whose existence was unknown
and who had failed to appear in court. They argued that given the
failure of other parties to appear, the trial court should conclude
that the Ruxton heirs were the closest heirs with a claim to the
property and, consequently, award them the interests of the absent
parties pursuant to Mass. Gen. Laws ch. 190 3, governing the
intestate descent and distribution of land.
 On September 28, 1998, the district court (Wolf, J.)
entered an order termed "Final Judgment of Distribution and
Entitlement" (the "Distribution"). The Distribution divided the
condemnation proceeds according to the Dallas Report, with only
minor exceptions not relevant here. Paragraph one of the order
distributed a portion of the award to the Ruxton heirs, and other
parties before the court, based on the percent that the Dallas
Report stated they had inherited. Paragraph two specified the
interests of the absent parties. Some of these absent parties were
identified by name and awarded a specific share of the condemnation
proceeds. Other absent parties, due to the incomplete information
in the Dallas report, were identified merely as heirs of various
Betsy I and Edmund II sub-lines about which little information was
known after the late 1800s or early 1900s. For example, the court
awarded the "Heirs of Amy Swett Higgins" approximately three
percent of the proceeds. Dallas had determined that Amy Higgins
died on January 3, 1878, but he was unable to locate her probate
records or determine whether she had children. 
 In addition to affirming the Dallas Report's genealogical
evidence, the district court established procedures for the parties
to claim their shares. The court ruled that "any person identified
in this paragraph 2 [listing awards for the absent heirs] or any
person entitled to take such person's share under applicable law
may, on petition to the court and upon notice to the United States
Attorney and full proof of right thereto, obtain an order directing
payment to him or her." The court also provided that five years
following the date of the judgment, unclaimed funds would be
removed from the court's own registry and deposited in the Treasury
of the United States, pursuant to 28 U.S.C 2042. The Ruxton
heirs brought this appeal and Attorney Croce appeals the district
court's refusal to award him attorneys' fees. 
 II.
Distribution of the condemnation award
 Rather than challenging the specific percentages awarded
in the Distribution, the Ruxton heirs argue that they, as the
closest heirs to come forward, are entitled to collect the shares
of the absent heirs pursuant to Mass. Gen. Laws ch. 190 3. 
Section 3 establishes a hierarchy of claims to an intestate's land,
giving the first claim to children and grandchildren, then to
parents, then to brothers and sisters and their children. If none
of these direct heirs exist, the statute provides for inheritance
by "collateral heirs": 

 (6) If [the intestate] leaves no issue, and no father, mother,
 brother or sister, and no issue of any deceased brother or
 sister, then to his next of kin in equal degree; but if there
 are two or more collateral kindred in equal degree claiming
 through different ancestors, those claiming through the
 nearest ancestor shall be preferred to those claiming through
 an ancestor more remote.
Under 3, the Ruxton heirs are "collateral heirs" to all of the
descendants of Betsy I and Edmund II. Although they are only
remote relatives of some of the absent parties, under 3 they have
inheritance rights to the interests of the absent parties if more
direct heirs do not exist. The Ruxton heirs suggest that the non-
appearance of more direct heirs creates a presumption that they do
not exist, and that their interest in the property would therefore
pass to the Ruxton claimants, the closest heirs who have appeared.
 The Ruxton heirs argue that the district court denied
them their claims to the funds of absent parties by escheating the
interests of the absent heirs to the United States. However, the
district court did not award the beneficial interest in these funds
to the United States and the Ruxton heirs' challenge to the
Distribution fails when deprived of this premise. We start by
analyzing the escheat claim, and then turn to the language of the
Distribution free from the misconception that it effects an
escheat.
A. 28 U.S.C. 2042 and Escheat
 According to the Ruxton heirs, the district court
effectuated an escheat by first setting aside approximately two-
thirds of the condemnation award for the absent heirs, and then
stating that these interests, if they went unclaimed for five
years, would be transferred to the United States Treasury in the
name and credit of the United States, pursuant to 28 U.S.C.
 2042. If 2042 awarded the interest of the absent heirs to the
United States, the Ruxton heirs would have a plausible argument
that the district court deprived them of their interest in the
condemnation fund. But 2042 does no such thing. While 2042
does provide that unclaimed funds will be deposited in the United
States Treasury "in the name and to the credit of the United
States," the statute goes on to state that "[a]ny claimant entitled
to any such money may, on petition to the court and upon notice to
the United States attorney and full proof of the right thereto,
obtain an order directing payment to him." The statute does not
extinguish claims to the moneys held in a condemnation fund; it
merely provides for the transfer of these funds to the United
States Treasury. 
 The Supreme Court has confirmed that the transfer of
funds from a district court to a general account in the United
States Treasury does not extinguish valid claims. See United
States v. Klein, 303 U.S. 276, 282 (1938). In Klein, the state of
Pennsylvania sought to collect funds transferred to the United
States Treasury pursuant to the largely identical predecessor to 
2042. The United States argued that since the funds had been
transferred to the Treasury, Pennsylvania could no longer recover
on its claim. The Court rejected this claim, noting that even
after deposit in the United States Treasury, "the fund remains
subject to the order of the District Court to be paid to the
persons lawfully entitled to it upon proof of their ownership." 
Id. at 280. Other courts have reached the same conclusion. See In
re Moneys Deposited, 243 F.2d 443, 445 (3d Cir. 1957) ("[A]lthough
such subsequent deposit in the federal Treasury is required by the
statute to be 'in the name and to the credit of the United States'
the fact is that the United States has no beneficial interest
therein but holds the money as statutory trustee for the rightful
owners when and if they are determined by the court.");United
States v Iovenelli, 403 F.2d 468, 469 (7th Cir. 1968); Hansen v.
United States, 340 F.2d 142, 144 (8th Cir. 1965). 
 The language of 2042 and the case law make clear that
the Ruxton heirs' entitlement to these funds, if any, exists
irrespective of whether the funds sit in the court registry or the
United States Treasury. Although we understand the Ruxton heirs'
desire to have their allotted interest in the funds of the absent
heirs finally decided, their assertion that the district court has
already ruled against them by escheating these funds to the United
States is erroneous.
B. Remaining Challenges to the Distribution
 Once we reject the Ruxton heirs' premise that the funds
escheated, it becomes clear that the district court has not yet
ruled on the Ruxton heirs' claims. Rather, the court, after
identifying the entitlements of the absent parties in paragraph
two, left open the question of who could claim their shares. The
court provided:
 Pursuant to 28 U.S.C. 2042, any person identified in
 this paragraph 2, or any other person entitled to take such
 person's share under applicable law, may, on petition to the
 court and upon notice to the United States Attorney and full
 proof of the right thereto, obtain an order directing payment
 to him or her." (emphasis added) 

This order does not bar the claims of the Ruxton heirs to the
portion of the award set aside for the absent parties. The Ruxton
heirs, if their claim has merit, are "identified in paragraph two"
or are entitled to these shares "under applicable law." The Ruxton
heirs are actually "identified" in some cases because, due to the
imperfect genealogical information, paragraph two often speaks of
categories of individuals entitled to make claims, such as "Heirs
of Lucille Elaine Sargent" or "Heirs of Lilla Rich Higgins." The
Ruxton claimants' central argument is that they are "heirs" of
these individuals and that they should inherit these interests
since more direct heirs have not appeared. Nothing in the
Distribution prevents the Ruxton claimants from filing a motion
below stating that they are, for example, the "heirs of Lilla Rich
Higgins" and thus entitled, under the very terms of the
Distribution, to these funds. 
 In other cases, the Ruxton heirs can claim that they are
"entitled to take such person's share under applicable law." The
Ruxton heirs can rely on this provision of the Distribution to take
the share of individuals who were specifically named in paragraph
two but who have not appeared in court (for example, John S.
Higgins and Richard H. Farmer). The Ruxton heirs have argued that
the failure of these individuals to appear creates a presumption in
Massachusetts law that they do not exist, and gives the Ruxton
heirs an entitlement to claim their shares "under applicable law." 
Thus, in cases where the absent parties are specifically named, as
well as those in which they are identified merely by category, the
Distribution does not foreclose the Ruxton heirs' Massachusetts
law-based claims. 
 Although we conclude that the Distribution does not
foreclose the Ruxton heirs' claims, we are not unsympathetic to
their predicament. The Ruxton heirs have moved on several
occasions to collect the portion of the fund set aside for absent
parties. Nonetheless, there is no ruling of the court that bars
them from asserting a claim under the terms set forth in the
Distribution, or otherwise conclusively determines that they could
not collect the shares of the absent heirs. Indeed, the record is
devoid of any indication that the district court evaluated whether
the funds set aside for absent parties could be claimed by
"collateral heirs." Given our involvement with this "collateral
heirs" issue in the Cadorette appeal, and our remand with the
instruction that the parties relitigate their claims, we conclude
that the silence below cannot be construed as an implicit denial of
the claims of the Ruxton heirs. Clearly, the district court cannot
defer indefinitely a ruling on the Ruxton heirs' claims. At the
same time, as we noted in Cadorette, "the court apparently retains
a degree of freedom to divide compensation (and to condition its
distribution) in a manner that seems fair, in light of the
possibility that 'lost' heirs may eventually appear." 988 F.2d at
224. Thus it was not error for the court to order that the funds be
distributed in accordance with the uncontested genealogical
evidence and then wait some additional time to see which, if any,
additional heirs appear. 
 There remains the question of the finality of the
Distribution for purposes of appeal. See Catlin v. United States,
324 U.S. 229, 233 (1945) ("[O]rdinarily in condemnation proceedings
appellate review may be had only upon an order or judgment
disposing of the whole case . . . . "). Although we have rejected
the escheat argument and concluded that the district court has not
yet ruled on the Ruxton heirs' claims, we affirm the judgment as
final pursuant to 28 U.S.C. 1291. The judgment is final in that
it conclusively (1) determines title to the eight acres, (2)
establishes the just compensation for that land, and (3)
establishes a right to collect those funds on the basis of
essentially undisputed genealogical evidence. The fact that the
Distribution does not always identify the specific individuals
entitled to bring claims against the fund (instead referring to
"Heirs of x" and to absent individuals whose existence is unknown)
does not defeat that finality. The attenuated interests in this
case make it difficult to establish with precision the claimants to
this fund. It thus made sense for the district court to determine
finally the genealogical breakdown before evaluating individual
claims that may fall under this breakdown. This approach is
analogous to that used in a complex class action, where a court may
enter a final judgment establishing an award for the class, but
leave for further hearings individual proof of class membership.
See, e.g. In re "Agent Orange" Product Liability Litigation, 818
F.2d 179, 181 (2d Cir. 1987) (reviewing as final a class action
distribution plan for victims of "Agent Orange" even though the
identification and entitlement of all class members had not yet
been determined). 
 The Ruxton heirs are free to return to the district court
and assert their claims to the funds of the absent parties. As we
noted in Cadorette, these claims raise the question of how best to
apply the Massachusetts law of descent and distribution to a
situation of considerable factual complexity. We will leave that
determination, in the first instance, to the district court.
 III.
Attorneys' Fees
 The Ruxton heirs argue that the district court awarded
inadequate fees to their attorney, John Hallisey, under the "common
fund" doctrine. Attorney Arthur Croce separately appeals, claiming
that the district court improperly denied him a share of the common
fund. 
 A common fund award "is an equitable award made at the
discretion of the district court." Kargman v. Sullivan, 589 F.2d
63, 69 (1st. Cir. 1978). "Moreover, because each common fund case
presents its own unique set of circumstances, trial courts must
assess each request for fees and expenses on its own terms." In re
Fidelity/Micron Securities Litig., 167 F.3d 735, 737 (1st Cir.
1999). The trial court enjoys "extremely broad" latitude in
determining the appropriate shares of the common fund, and may
calculate such an award either on the basis of a reasonable
percentage of the fund, or using a lodestar method to multiply a
reasonable hourly rate by the compensable hours the attorney worked
on the matter. In re Thirteen Appeals Arising out of the San Juan
Dupont Plaza Hotel Fire, 56 F.3d 295, 307, 309 (1st Cir. 1995).
 The district court did not abuse its discretion in
awarding Hallisey $37,500, approximately twenty-three percent of
the $168,000 common fund. In reaching this decision, the district
court closely reviewed the hours Hallisey worked generating the
condemnation fund, and used these hours to generate a "lodestar"
fee (250 hours multiplied by $150 per hour). The district court
then concluded that this fee amounted to a reasonable percentage of
the common fund and was "consistent with the court's evaluation of
Hallisey's contribution to the case." We find this fee to be
reasonable, and we are unwilling to second-guess the district
court's assessment of Hallisey's efforts.
 Likewise, the court did not abuse its discretion in
denying Croce any award under the common fund doctrine. The court
found that although Croce had generated a portion of the award in
the Cadorette quiet title action (where he had been compensated),
his submissions in the condemnation proceedings "were not valuable
to this court" and that "it was evident from the outset that Croce
was involved to pursue his interest in obtaining attorney's fees." 
Indeed, Croce represented only nominal parties in the condemnation
action who themselves received no compensation. Given the district
court's findings, there was no abuse of discretion in denying Croce
a share of the common fund. 
 AFFIRMED.