UNITED STATES, Plaintiff, Appellee,

v.

**8.0 ACRES OF LAND, More or Less, Situated in Barnstable County, Commonwealth of Massachusetts; Raymond W. Cobb, Defendants**

**Mary Virginia Brandt Ruxton; Estate of Jean Stevenson Clark; Norman S. Rose; Elmer Q. Rose; Austin L. Rose, Estate of Priscilla L. Rose; John D. Hallisey, Defendants, Appellees**

**Roger Treat Jackson, Jr.; Margery Jackson Chambers; Betsey Jackson Patterson; Barbara Jackson Allgeier, Defendants, Appellants**

**Arthur C. Croce, Appellant.**

**United States, Plaintiff, Appellee,**

v.

**8.0 Acres of Land, More or Less, Situated in Barnstable County, Commonwealth of Massachusetts; Raymond W. Cobb, Defendants**

**Mary Virginia Brandt Ruxton; Estate of Jean Stevenson Clark; Norman S. Rose; Elmer Q. Rose; Austin L. Rose; Estate of Priscilla L. Rose; John D. Hallisey, Defendants, Appellants**

**Roger Treat Jackson, Jr.; Margery Jackson Chambers; Betsey Jackson Patterson; Barbara Jackson Allgeier, Defendants, Appellees,**

---

Arthur C. Croce, Appellee.

Nos. 98–2257, 98–2313.

United States Court of Appeals,
First Circuit.

Heard Aug. 2, 1999.

Decided Nov. 30, 1999.

See also: 988 F.2d 215.

John D. Hallisey for Mary Virginia Brandt Ruxton et al.

John T. Stahr, Dept. of Justice, with whom Lois J Schiffer, Asst. Attorney General, Donald K. Stern, United States Attorney and George B. Henderson, II, Asst. United States Attorney, John A. Bryson and Joy Ryan, Attorneys, Dept. of Justice were on brief, for appellee United States.

Arthur C. Croce, for Roger Treat Jackson, Jr., et al. and pro se.

Before Selya, Circuit Judge, Cyr, Senior Circuit Judge, and Lipez, Circuit Judge.

LIPEZ, Circuit Judge.

Mary Brandt Ruxton, the estate of Jean Stevenson Clark, Norman S. Rose, Elmer Q. Rose, Austin L. Rose, and the estate of Priscilla L. Rose (collectively the "Ruxton heirs" or "Ruxton claimants") appeal from an order of the United States District Court for the District of Massachusetts establishing the interest of several dozen claimants in a condemnation award. The Ruxton heirs argue that, in addition to the share awarded to them by the trial court, they are entitled to claim the interest of absent heirs who did not appear in court and whose existence, in some cases, cannot be confirmed (the "absent heirs"). The Ruxton heirs claim that the district court deprived them of this entitlement by ruling that the unclaimed funds would escheat to the United States. The Ruxton heirs also argue that the trial court awarded inadequate attorneys' fees under the common fund doctrine. Arthur C. Croce, an attorney representing different claimants in an earlier, related, action, also appeals, asserting that the trial court erred in concluding that he was not entitled to attorneys' fees in the instant case.

We affirm the district court's order, finding that it did not escheat funds to the United States and that it properly appor-

tioned the condemnation award according to largely uncontested genealogical evidence. Pursuant to that order, the Ruxton heirs may still claim that they are entitled to collect a portion of the award reserved for the absent heirs. Their entitlement to the funds of the absent heirs is, therefore, not yet ripe for our resolution. We likewise affirm the district court's judgment as to attorneys' fees.

## I.

### Background

The instant dispute has a long history, discussed also in our decision in *Cadorette v. United States*, 988 F.2d 215 (1st Cir. 1993). Here, we sketch the outlines, focusing on the specifics relevant to this dispute.

### A. *The Land Purchase*

In 1972, the United States purchased eight acres of land in Truro, Massachusetts (the "eight acres") for inclusion in the Cape Cod National Seashore. Regrettably, the seller of the property, Elizabeth Freeman, owned only a small fraction of the land she purported to convey. Elizabeth's great grandfather, Edmund Freeman (referred to as "Edmund the Elder"), had owned 100 percent of the land when he died intestate in 1870. At his death, his three surviving children and the direct descendants of his fourth child each received an undivided twenty-five percent interest in the property. We shall refer to these four lines as "Charles," "Betsy I," "Edmund II," and "Richard Sr." These four twenty-five percent interests continued to descend over the next century, through more than 100 heirs, most of whom did not know that they owned an interest in the eight acres.

### B. *The Quiet Title Action*

The defects in the land sale came to light in 1984, when Jean Stevenson Clark sued the United States pursuant to 28 U.S.C. § 2409(a) to "quiet title" to what she claimed was her share in the eight acres. Soon, others intervened in the lawsuit, all claiming that they too were heirs of Edmund the Elder and thus owned a share of the property that Elizabeth had sold to the government. The trial court (Skinner, J.) divided the interests in the property based on its reading of the Massachusetts law governing descent and distribution. *See Cadorette v. United States*, 1990 WL 149979 (No. 84–2428–S) (D. Mass. Sept. 18, 1990). The United States appealed, arguing that the trial court misapplied Massachusetts law. While the appeal was pending, the United States filed a complaint in condemnation pursuant to 40 U.S.C. § 257, seeking to acquire whatever interest in the land that it did not own already.

On appeal, we concluded that the trial court had properly distributed the interests of two of the four original heirs to the eight acres, Charles and Richard Sr. *See Cadorette v. United States*, 988 F.2d 215 (1st Cir.1993). That part of the judgment was final. But we vacated the trial court's decision to distribute the interest of the other two original heirs, Betsy I and Edmund II, solely to those litigants who were presently before it. We observed that the district court had learned "very little" about these two lines and that the record contained "no evidence of any significant effort to locate, or to provide notice to, the descendants of Betsy I or Edmund II." *Id.* at 219, 221. Given the sparsity of information, the district court had inappropriately presumed that Betsy I and Edmund II's lines had died out, and it had been particularly inappropriate to presume that they had died out during the one seven-year period under which the parties before the court would be entitled, under Massachusetts law, to their entire interest in the land. *See id.*

In *Cadorette*, we declined to determine "precisely how Massachusetts law ought to apply" because the government had since filed a condemnation action. *Id.* at 222. We ruled that the initiation of condemna-

tion proceedings mooted the "quiet title" dispute, and thus displaced any further need for the trial court to determine the interest of Betsy I and Edmund II in the quiet title action. By filing a condemnation action, the government would acquire the fifty percent interest in the eight acres that had passed through Betsy I and Edmund II upon payment of "just compensation." *See id.* at 222–26. We ruled that upon a further search for heirs of Betsy I and Edmund II, "the district court should determine afresh whom to compensate for those shares." *Id.* at 222.

### C. *The Condemnation Proceedings*

In the condemnation proceedings that followed our decision in *Cadorette,* the parties stipulated that the "just compensation" for Betsy I and Edmund II's fifty percent interest in the eight acres was $162,000. The issue turned, once again, to distribution. The United States presented the findings of its expert genealogist, George M. Dallas, who had authored a report tracing the devolution of ownership interests of Betsy I and Edmund II (the "Dallas Report"). Although Dallas identified some direct descendants of Betsy I and Edmund II who had inherited an interest in the property, the information about these lines was still incomplete. For example, Dallas learned that Betsy I had eleven children between 1830 and 1854 and that she left her estate to thirteen children and grandchildren. What became of all of these heirs, however, was (and is) unknown. For example, the Dallas Report concluded that the "Heirs of William Edward Sargent" (Betsy I's grandson) were entitled to a specific share of the eight acres, but it failed to specify who those heirs were.

The Ruxton heirs did not contest Dallas's genealogical findings. They did, however, file motions arguing that the court should award them the shares of heirs whose existence was unknown and who had failed to appear in court. They argued that given the failure of other parties to appear, the trial court should conclude that the Ruxton heirs were the closest heirs with a claim to the property and, consequently, award them the interests of the absent parties pursuant to Mass. Gen. Laws ch. 190 § 3, governing the intestate descent and distribution of land.

On September 28, 1998, the district court (Wolf, J.) entered an order termed "Final Judgment of Distribution and Entitlement" (the "Distribution"). The Distribution divided the condemnation proceeds according to the Dallas Report, with only minor exceptions not relevant here. Paragraph one of the order distributed a portion of the award to the Ruxton heirs, and other parties before the court, based on the percent that the Dallas Report stated they had inherited. Paragraph two specified the interests of the absent parties. Some of these absent parties were identified by name and awarded a specific share of the condemnation proceeds. Other absent parties, due to the incomplete information in the Dallas report, were identified merely as heirs of various Betsy I and Edmund II sub-lines about which little information was known after the late 1800s or early 1900s. For example, the court awarded the "Heirs of Amy Swett Higgins" approximately three percent of the proceeds. Dallas had determined that Amy Higgins died on January 3, 1878, but he was unable to locate her probate records or determine whether she had children.

■ In addition to affirming the Dallas Report's genealogical evidence, the district court established procedures for the parties to claim their shares. The court ruled that "any person identified in this paragraph 2 [listing awards for the absent heirs] or any person entitled to take such person's share under applicable law may, on petition to the court and upon notice to the United States Attorney and full proof of right thereto, obtain an order directing payment to him or her." The court also provided that five years following the date of the judgment, unclaimed funds would be

removed from the court's own registry and deposited in the Treasury of the United States, pursuant to 28 U.S.C § 2042. The Ruxton heirs brought this appeal and Attorney Croce appeals the district court's refusal to award him attorneys' fees.[1]

## II.

### Distribution of the condemnation award

Rather than challenging the specific percentages awarded in the Distribution, the Ruxton heirs argue that they, as the closest heirs to come forward, are entitled to collect the shares of the absent heirs pursuant to Mass. Gen. Laws ch. 190 § 3. Section 3 establishes a hierarchy of claims to an intestate's land, giving the first claim to children and grandchildren, then to parents, then to brothers and sisters and their children. If none of these direct heirs exist, the statute provides for inheritance by "collateral heirs":

> (6) If [the intestate] leaves no issue, and no father, mother, brother or sister, and no issue of any deceased brother or sister, then to his next of kin in equal degree; but if there are two or more collateral kindred in equal degree claiming through different ancestors, those claiming through the nearest ancestor shall be preferred to those claiming through an ancestor more remote.

Under § 3, the Ruxton heirs are "collateral heirs" to all of the descendants of Betsy I and Edmund II. Although they are only remote relatives of some of the absent parties, under § 3 they have inheritance rights to the interests of the absent parties if more direct heirs do not exist. The Ruxton heirs suggest that the non-appearance of more direct heirs creates a presumption that they do not exist, and that their interest in the property would therefore pass to the Ruxton claimants, the closest heirs who have appeared.

The Ruxton heirs argue that the district court denied them their claims to the funds of absent parties by escheating[2] the interests of the absent heirs to the United States. However, the district court did not award the beneficial interest in these funds to the United States and the Ruxton heirs' challenge to the Distribution fails when deprived of this premise. We start by analyzing the escheat claim, and then turn to the language of the Distribution free from the misconception that it effects an escheat.

### A. *28 U.S.C. § 2042 and Escheat*

According to the Ruxton heirs, the district court effectuated an escheat by first setting aside approximately two-thirds of the condemnation award for the absent heirs, and then stating that these interests, if they went unclaimed for five years, would be transferred to the United States Treasury in the name and credit of the United States, pursuant to 28 U.S.C. § 2042.[3] If § 2042 awarded the interest of

---

1. The United States has also filed a brief, stating that the district court Distribution (which it helped prepare) should be affirmed. The Ruxton heirs challenge the United States' involvement, arguing that the government has no standing to participate in the distribution of a condemnation award once it takes title to the land and the amount of just compensation has been finally determined. While it may be true that the United States has no standing to *appeal* from a distribution order, *see United States v. Adamant Co.*, 197 F.2d 1, 5 (9th Cir.1952), the United States is entitled to file a brief requesting that the district court judgment be affirmed when other parties initiate an appeal. *See Scully v. United States*, 409 F.2d 1061, 1063 n. 1 (10th Cir.1969). The United States, both here and below, simply

provides its advisory views, pursuant to the general duties under Fed.R.Civ.P. 71A (j) to "expedite the proceedings for the distribution of money so deposited and for the ascertainment and payment of just compensation."

2. Black's Law Dictionary (6th ed.1990) defines escheat as "[a] reversion of property to the state in consequence of a want of any individual competent to inherit."

3. Section 2042 provides:

   No money deposited under section 2041 of this title shall be withdrawn except by order of court.

   In every case in which the right to withdraw money deposited in court under sec-

the absent heirs to the United States, the Ruxton heirs would have a plausible argument that the district court deprived them of their interest in the condemnation fund. But § 2042 does no such thing. While § 2042 does provide that unclaimed funds will be deposited in the United States Treasury "in the name and to the credit of the United States," the statute goes on to state that "[a]ny claimant entitled to any such money may, on petition to the court and upon notice to the United States attorney and full proof of the right thereto, obtain an order directing payment to him." The statute does not extinguish claims to the moneys held in a condemnation fund; it merely provides for the transfer of these funds to the United States Treasury.

The Supreme Court has confirmed that the transfer of funds from a district court to a general account in the United States Treasury does not extinguish valid claims. *See United States v. Klein*, 303 U.S. 276, 282, 58 S.Ct. 536, 82 L.Ed. 840 (1938). In *Klein*, the state of Pennsylvania sought to collect funds transferred to the United States Treasury pursuant to the largely identical predecessor to § 2042. The United States argued that since the funds

had been transferred to the Treasury, Pennsylvania could no longer recover on its claim. The Court rejected this claim, noting that even after deposit in the United States Treasury, "the fund remains subject to the order of the District Court to be paid to the persons lawfully entitled to it upon proof of their ownership." *Id.* at 280, 58 S.Ct. 536. Other courts have reached the same conclusion. *See In re Moneys Deposited*, 243 F.2d 443, 445 (3d Cir.1957) ("[A]lthough such subsequent deposit in the federal Treasury is required by the statute to be 'in the name and to the credit of the United States' the fact is that the United States has no beneficial interest therein but holds the money as statutory trustee for the rightful owners when and if they are determined by the court."); *see also United States v. Iovenelli*, 403 F.2d 468, 469 (7th Cir.1968); *Hansen v. United States*, 340 F.2d 142, 144 (8th Cir.1965).[4]

■ The language of § 2042 and the case law make clear that the Ruxton heirs' entitlement to these funds, if any, exists irrespective of whether the funds sit in the court registry or the United States Treasury.[5] Although we understand the Rux-

tion 2041 has been adjudicated or is not in dispute and such money has remained so deposited for at least five years unclaimed by the person entitled thereto, such court shall cause such money to be deposited in the Treasury in the name and to the credit of the United States. Any claimant entitled to any such money may, on petition to the court and upon notice to the United States attorney and full proof of the right thereto, obtain an order directing payment to him. Section 2041, titled "Deposit of moneys in pending or adjudicated cases" in turn provides that:

All moneys paid into any court of the United States, or received by the officers thereof, in any case pending or adjudicated in such court, shall be forthwith deposited with the treasurer of the United States or a designated depositary, in the name and to the credit of such court.

This section shall not prevent the delivery of any such money to the rightful owners upon security, according to agreement of parties, under the direction of the court.

4. Although one court has labeled the § 2042 process "impermanent escheat," even that court recognized that § 2042 provides the United States with only "interim governmental use" of the funds and "permits an entitled claimant to recover from the United States." *In re Folding Carton Antitrust Litig.*, 744 F.2d 1252, 1255 (7th Cir.1984).

5. Additionally, the Ruxton heirs claimed at oral argument that § 2042 does not apply to condemnation funds. This position is inaccurate. The statute broadly addresses the "withdraw[al]" of funds which under 28 U.S.C. § 2041 have been "paid into any court of the United States" in any case pending or adjudicated in such court. At least one court has explicitly relied upon § 2041 in arranging for the distribution of condemnation awards. *See National R.R. Passenger Corp. ("Amtrak") v. 10,178 Square Feet of Land*, 132 F.R.D. 356, 358–59 (S.D.N.Y.1990). While a court may not be *required* to follow § 2041 and § 2042 in arranging for the equitable distribution of a fund, *c.f. Van Gemert v. Boeing Co.*, 739 F.2d 730, 735–36 (2d Cir.1984) (class action settle-

ton heirs' desire to have their allotted interest in the funds of the absent heirs finally decided, their assertion that the district court has already ruled against them by escheating these funds to the United States is erroneous.

### B. Remaining Challenges to the Distribution

Once we reject the Ruxton heirs' premise that the funds escheated, it becomes clear that the district court has not yet ruled on the Ruxton heirs' claims. Rather, the court, after identifying the entitlements of the absent parties in paragraph two, left open the question of who could claim their shares. The court provided:

> Pursuant to 28 U.S.C. § 2042, any person identified in this paragraph 2, *or any other person entitled to take such person's share under applicable law,* may, on petition to the court and upon notice to the United States Attorney and full proof of the right thereto, obtain an order directing payment to him or her. (emphasis added)

This order does not bar the claims of the Ruxton heirs to the portion of the award set aside for the absent parties. The Ruxton heirs, if their claim has merit, are "identified in paragraph two" or are entitled to these shares "under applicable law." The Ruxton heirs are actually "identified" in some cases because, due to the imperfect genealogical information,

paragraph two often speaks of *categories* of individuals entitled to make claims, such as "Heirs of Lucille Elaine Sargent" or "Heirs of Lilla Rich Higgins." [6] The Ruxton claimants' central argument is that they *are* "heirs" of these individuals and that they should inherit these interests since more direct heirs have not appeared. Nothing in the Distribution prevents the Ruxton claimants from filing a motion below stating that they are, for example, the "heirs of Lilla Rich Higgins" and thus entitled, under the very terms of the Distribution, to these funds.

In other cases, the Ruxton heirs can claim that they are "entitled to take such person's share under applicable law." The Ruxton heirs can rely on this provision of the Distribution to take the share of individuals who *were* specifically named in paragraph two but who have not appeared in court (for example, John S. Higgins and Richard H. Farmer). The Ruxton heirs have argued that the failure of these individuals to appear creates a presumption in Massachusetts law that they do not exist, and gives the Ruxton heirs an entitlement to claim their shares "under applicable law." Thus, in cases where the absent parties are specifically named, as well as those in which they are identified merely by category, the Distribution does not foreclose the Ruxton heirs' Massachusetts law-based claims.[7]

---

ment distribution), it is not precluded from doing so.

6. Paragraph two provided the following percent awards (where 1.0 is 100%) for those "who have not entered an appearance or acknowledged service of the complaint":

| Name | Percentage |
| --- | --- |
| John S. Higgins | 0.01389 |
| Richard R. Higgins | 0.01389 |
| Heirs of Lilla Rich Higgins | 0.02778 |
| Ellen Virginia Sargent | 0.02037 |
| Dorothy Madeline Cushing | 0.02037 |
| Helen Barbara Cushing | 0.02037 |
| Heirs of Frederick Barlow Higgins | 0.02778 |
| Heirs of Amy Swett Higgins | 0.02778 |
| Heirs of John Swett Higgins | 0.02778 |
| Vera Dubois Sargent | 0.01667 |
| Elizabeth Proctor Sargent | 0.01667 |

| | |
| --- | --- |
| Heirs of Frederick Amasa Sargent | 0.03333 |
| Heirs of William Edward Sargent | 0.03333 |
| Heirs of Lucille Elaine Sargent | 0.03333 |
| Estate of Lyle F. Hodgkins | 0.01543 |
| Richard H. Farmer | 0.02701 |
| Robert C. Farmer | 0.02701 |
| Rebecca Freeman Stahl | 0.01350 |
| Sadie Freeman Schwartz | 0.01350 |
| Isaac Freeman | 0.01350 |
| Esther Freeman Lobel | 0.01350 |
| Catherine G. Dwyer | 0.01543 |
| Heirs of Olga Marguerite Brandt | 0.02430 |
| Heirs of Edmund J. Freeman | 0.13888 |

7. At times, the Ruxton heirs appear to advance a broader argument that condemnation law requires the full distribution of the fund to the parties who do appear, *regardless* of whether these parties can prove an interest in the funds set aside for absent parties. The

██ Although we conclude that the Distribution does not foreclose the Ruxton heirs' claims, we are not unsympathetic to their predicament. The Ruxton heirs have moved on several occasions to collect the portion of the fund set aside for absent parties. Nonetheless, there is no ruling of the court that bars them from asserting a claim under the terms set forth in the Distribution, or otherwise conclusively determines that they could not collect the shares of the absent heirs.[8] Indeed, the record is devoid of any indication that the district court evaluated whether the funds set aside for absent parties could be claimed by "collateral heirs." Given our involvement with this "collateral heirs" issue in the *Cadorette* appeal, and our remand with the instruction that the parties relitigate their claims, we conclude that the silence below cannot be construed as an implicit denial of the claims of the Ruxton heirs. Clearly, the district court cannot defer indefinitely a ruling on the Ruxton heirs' claims. At the same time, as we noted in *Cadorette,* "the court apparently retains a degree of freedom to divide compensation (and to condition its distribution) in a manner that seems fair, in light of the possibility that 'lost' heirs may eventually appear." 988 F.2d at 224. Thus it was not error for the court to order that the funds be distributed in accordance with the uncontested genealogical evidence and then wait some additional time to see which, if any, additional heirs appear.

██ There remains the question of the finality of the Distribution for purposes of appeal. *See Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 (1945) ("[O]rdinarily in condemnation proceedings appellate review may be had only upon an order or judgment disposing of the whole case. . . ."). Although we have rejected the escheat argument and concluded that the district court has not yet ruled on the Ruxton heirs' claims, we affirm the judgment as final pursuant to 28 U.S.C. § 1291.[9] The judgment is final in that it conclusively (1) determines title to the eight acres, (2) establishes the just compensation for that land, and (3) establishes a right to collect those funds on the basis of essentially undisputed genealogical evidence. The fact that the Distribution does not always identify the specific individuals entitled to bring claims against the fund (instead referring to "Heirs of x" and to absent individuals whose existence is unknown) does not defeat that finality. The attenuated interests in this case make it difficult to establish with precision the claimants to this fund. It thus made sense for the district court to determine finally the genealogical breakdown before evaluating individual claims that may fall under this breakdown. This approach is analogous to that used in a complex class action, where a court may enter a final judgment establishing an award for the class, but leave for further hearings individual proof of class membership. *See, e.g., In re "Agent Orange" Prod. Liab. Litig.,* 818 F.2d 179, 181 (2d Cir.1987) (reviewing as final a class action distribution plan for victims of "Agent Orange" even though the

---

Distribution does not foreclose this argument either. Ruxton et al. are free to submit a claim to the district court stating that they are "entitled ... under applicable law" to take the shares of absent parties even without proving that they have an ownership interest in these shares.

8. In fact, the Ruxton heirs concede in their reply brief that: "The district court did not adjudicate Ruxton's Petition for Determination of Title and Motion for Distribution of the

Entire Award. (Both based, in part, on collateral heirship . . . .)."

9. Section 1291 reads, in relevant part:
The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court.

identification and entitlement of all class members had not yet been determined).

The Ruxton heirs are free to return to the district court and assert their claims to the funds of the absent parties. As we noted in *Cadorette*, these claims raise the question of how best to apply the Massachusetts law of descent and distribution to a situation of considerable factual complexity. We will leave that determination, in the first instance, to the district court.

### III.

#### Attorneys' Fees

The Ruxton heirs argue that the district court awarded inadequate fees to their attorney, John Hallisey, under the "common fund" doctrine. Attorney Arthur Croce separately appeals, claiming that the district court improperly denied him a share of the common fund.

A common fund award "is an equitable award made at the discretion of the district court." *Kargman v. Sullivan*, 589 F.2d 63, 69 (1st. Cir.1978). "Moreover, because each common fund case presents its own unique set of circumstances, trial courts must assess each request for fees and expenses on its own terms." *In re Fidelity/Micron Securities Litig.*, 167 F.3d 735, 737 (1st Cir.1999). The trial court enjoys "extremely broad" latitude in determining the appropriate shares of the common fund, and may calculate such an award either on the basis of a reasonable percentage of the fund, or using a lodestar method to multiply a reasonable hourly rate by the compensable hours the attorney worked on the matter. *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire*, 56 F.3d 295, 307, 309 (1st Cir.1995).

The district court did not abuse its discretion in awarding Hallisey $37,500, approximately twenty-three percent of the $168,000 common fund. In reaching this decision, the district court closely reviewed the hours Hallisey worked generating the condemnation fund, and used these hours to generate a "lodestar" fee (250 hours multiplied by $150 per hour). The district court then concluded that this fee amounted to a reasonable percentage of the common fund and was "consistent with the court's evaluation of Hallisey's contribution to the case." We find this fee to be reasonable, and we are unwilling to second-guess the district court's assessment of Hallisey's efforts.

Likewise, the court did not abuse its discretion in denying Croce any award under the common fund doctrine. The court found that although Croce had generated a portion of the award in the *Cadorette* quiet title action (where he had been compensated), his submissions in the condemnation proceedings "were not valuable to this court" and that "it was evident from the outset that Croce was involved to pursue his interest in obtaining attorney's fees." Indeed, Croce represented only nominal parties in the condemnation action who themselves received no compensation. Given the district court's findings, there was no abuse of discretion in denying Croce a share of the common fund.

*AFFIRMED.*