# United States Court of Appeals
## For the Eighth Circuit
_____

No. 23-2869
_____

Guy Gambrell, Jr.; Fadilah Gambrell

*Plaintiffs - Appellants*

v.

United States of America

*Defendant - Appellee*
_____

Appeal from United States District Court
for the Western District of Missouri - Joplin
_____

Submitted: June 13, 2024
Filed: August 2, 2024
_____

Before COLLOTON, Chief Judge, MELLOY and GRUENDER, Circuit Judges.
_____

MELLOY, Circuit Judge.

Plaintiffs Guy Gambrell, Jr., and Fadilah Gambrell brought claims against the United States pursuant to the Quiet Title Act, 28 U.S.C. § 2409a(a) (the Act). The

district court[1] determined the action was barred by the Act's 12-year statute of limitations. *Id.* § 2409a(g). We affirm.

I.

A. The United States Army Corps of Engineers' 1950s Land Acquisitions and Subsequent Nearby Land Development

In 1956, the United States, through the Army Corps of Engineers (Corps), purchased land from J.O. and Ada I. Melton pursuant to a general warranty deed. Using traditional surveying descriptions including township, range, and county, the land the United States purchased was bounded on its western edge, in relevant part, by the centerline of the "Fractional SW ¼ of Fractional Section 35" (the "true centerline"). In 1962, the Meltons subdivided adjacent land that they had retained (land directly to the west of the Corps' 1956 purchase). The plat map for the subdivision indicated the presence of stone at a corner location (referred to throughout this case as the "Peter's Stone"). Neither the legal description for the Corps' purchase nor the legal description for the subdivision, however, referenced a "stone." The Peter's Stone on the plat map suggested the stone marked the centerline. Accordingly, looking only at the 1962 plat map, the Peter's Stone appeared to mark the location of a north-south line defining the boundary between land sold to the Corps in 1956 and land retained by Meltons. By the mid-1970s, a family named Highfill owned Lot 8 of the subdivision.

In 1957, the Corps purchased land from J.E. Paine and Hattie Ethel Paine with a border that relied on the same legal description and true centerline. By the mid-1970s, a family named Boler owned land adjacent to and west of the land the Corps purchased from the Paines in 1957.

---

[1]The Honorable Brian C. Wimes, United States District Judge for the Western District of Missouri.

In 1974, the Corps conducted a survey which revealed the Peter's Stone referenced on the subdivision plat map was not located at the true centerline. Rather, the Peter's Stone was roughly 66 to 80 feet east of the true centerline. The Corps placed a surveying monument at the accurately measured centerline. Based on the Corps' survey, a dispute arose concerning a strip of land between the monument and the Peter's Stone with undisputed boundaries on the north and south ends. If the Peter's Stone were treated as the relevant centerline defining the western boundary of the Corps' land, then the Corps' land did not extend as far west as the Corps asserted. If the accurate survey and monument controlled, the Corps' land extended farther west than suggested by the 1962 subdivision plat map. Pursuant to the 1962 subdivision plat map, all of Lot 7 and substantial portions of Lots 8–11 of the subdivision lie in whole or in part on the disputed land.

## B. 1970s Litigation

In 1977, relying in part on the 1974 survey, the United States brought quiet title actions in the United States District Court for the Western District of Missouri against the Highfills (the owners of Lot 8 of the 1962 subdivision) and against the Bolers. The court consolidated the actions. The owners of Lots 7 and 9–11 of the subdivision were not parties to the action even though, according to the 1962 plat map, Lots 7–11 were all affected by the location of the centerline. The parties agreed that the Corps' monument reflected the accurate surveying centerline. They also agreed that the Peter's Stone had been present long before 1956. The parties disputed what the Meltons had *intended* to transfer to the Corps in 1956 and what the Paines had *intended* to transfer to the Corps in 1957.

In 1979, in an unappealed written opinion, the court reviewed the history of transactions involving the disputed land going back several decades and leading up to the time of the dispute. The Highfills, the Bolers, and the United States submitted evidence and testimony regarding surveys, surveying practices, and the likely understandings of prior transferors and transferees regarding the legal effect of the Peter's Stone. The court also heard testimony describing purported discussions after

1956 between United States employees and affected landowners. The district court discussed the law of deed reformation and found, based on the specific evidence presented in the case, that the Meltons and the Corps in 1956, and the Paines and the Corps in 1957, likely operated on the mutually mistaken belief that the Peter's Stone marked the true centerline of the SW ¼ of Fractional Section 35.

As a remedy, however, the court in 1979 did not award to the Highfills the entirety of Lot 8 as it would have existed if the Peter's Stone were treated as the true centerline. And as to the Bolers, the district court ordered no specific remedy at all. Rather, as to the Highfills and Lot 8, the 1979 court awarded to the Highfills a 0.07-acre portion of Lot 8 described in surveyor's language commencing from the Corps' monument. The 0.07 acres did not extend as far east as the Peter's Stone. This grant matched the land identified by the United States and the Highfills as being at issue; the United States had sought to quiet title to this small, disputed portion of Lot 8, and the Highfills had not counterclaimed to bring the apparent entirety of Lot 8 into the case.

As to the Bolers, the 1979 court ordered no specific remedy. The Bolers had built a deck that encroached on the land that was in dispute in their case. The court ordered the Bolers and the Corps to enter into negotiations, devise a solution, and report back to the court. There is nothing in the record to indicate what, if anything, the Bolers and the Corps did in response to the court's order. In 1989, the United States filed the 1979 federal district court judgment with the county recorder.

C. The Present Owners and the Present Dispute

In 2019, the present plaintiffs, the Gambrells, purchased Lots 7 and 9–15 of the subdivision except for the north 10 feet of Lot 9 (the lot adjacent to and immediately to the south of the previously contested Lot 8). In January 2020, the Gambrells approached the Corps to obtain a permit for clearing vegetation from land near their lots. At that time, the Corps expressly notified the Gambrells of the Corps' understanding that the true centerline was marked by the Corps' surveying

monument rather than the Peter's Stone and that the Corps' land extended west to that monument.

When the Gambrells purchased their lots, the Corps' monument had been in place for approximately 45 years. The 1979 judgment had been in place for over 40 years, and it had been in the county land records for over 30 years. The Gambrells did not commission a survey. By the time of the Gambrells' purchase, a house had been built on Lots 10 and 11, and the northeast corner of the house extended east, across the line marked by the Corps' monument and into the disputed area.

The Gambrells initiated the present quiet title action under the Act in 2021. The United States moved for summary judgment citing the 1979 judgment as recorded in 1989 and referencing the 1974 monument. According to the United States, the 1979 judgment did not finally resolve questions regarding the location of the eastern boundary of Lot 8 much less the boundaries of Lot 7 or Lots 9–11 of the subdivision. The United States, therefore, asserted that the 1974 monument and the 1979 judgment provided, at most, notice to the world of a *potential* dispute and blemish on title.

The Gambrells resisted. They also moved for summary judgment on the merits, seeking resolution of the quiet title matter in their favor. They characterized the 1979 judgment as effecting a reformation of the 1956 deed between the Meltons and the Corps. They also characterized the 1989 recording of the judgment as providing effective notice to the world (themselves included)[2] that the Peter's Stone

_____

[2]The Gambrells raised for the first time on appeal an argument that the 1979 judgment did not lie in their chain of title such that it could not have put them on constructive notice. *See Gross v. Watts*, 104 S.W. 30, 36 (Mo. 1907) ("[A] deed or instrument lying outside of the purchaser's chain of title imports no notice to him."); *see also Basore v. Johnson*, 689 S.W.2d 103, 109–10 (Mo. Ct. App. 1985). By not raising this argument below, it was waived. *See United States v. Hirani*, 824 F.3d 741, 751 (8th Cir. 2016) ("Ordinarily, we will not consider an argument raised for the first time on appeal."). At any rate, without their present arguments based on the purported conclusiveness of the 1979 judgment, the Gambrells are left with the

marked: (1) the western boundary of the 1956 Corps purchase, and (2) the eastern boundary of the subdivision.  According to the Gambrells, the Act's 12-year statute of limitations could not have been triggered until the United States took some action after 1979 that was *inconsistent* with the Gambrells' interpretation of the 1979 judgment.  The Gambrells identified their own 2020 discussion with Corps personnel involving a vegetation permit as the triggering event providing actual notice of the United States' adverse claim to the land between the Peter's Stone and the Corps' surveying monument.  Finally, the Gambrells argued the United States was barred by collateral estoppel from denying that the 1979 judgment had reformed the 1956 deed by treating the true centerline as the Peter's Stone.

The court acknowledged the Gambrells' assertion that the 1989 recording provided clear notice to the world of the 1979 judgment.  The court, however, concluded that the recorded judgment identified the disputed centerline as an issue without clearly establishing the Peter's Stone as the eastern boundary of Lot 8.  The court noted that the 1979 judgment provided only a limited remedy to the Highfills and said nothing regarding Lots 7 or Lots 9–11, whose owners had not been parties to the earlier action.  Finally, the district court emphasized that the triggering event for the Act's statute of limitations is not notice or constructive notice of conclusive proof of a valid and meritorious claim by the United States.  Rather, the Act sets a low bar for statute of limitations purposes; the triggering event need only be constructive notice of a reasonable claim by the United States.  Based on the foregoing, the court applied the statute of limitations and granted summary judgment for the United States.  In doing so, the district court noted that the grant of summary judgment resolved nothing as to the parties' actual boundary dispute.  Rather, it left the United States free to bring its own quiet title action and left the Gambrells free to risk acting on their belief of the relevant centerline's location.

---

Peter's Stone and the 1974 monument.  These conspicuous physical items together, and in the absence of the judgment, easily provided physical constructive notice to the Gambrells' predecessors of a potential dispute.

II.

We review *de novo* a grant of summary judgment based on a statute of limitations. *See Knapp v. FAG Bearings, LLC*, 69 F.4th 513, 516 (8th Cir. 2023). The Act provides, "Any civil action under this section, except for an action brought by a State, shall be barred unless it is commenced within twelve years of the date upon which it accrued. Such action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States." 28 U.S.C. § 2409a(g). Recently, the Supreme Court clarified that the statute of limitations in the Act is non-jurisdictional. *See Wilkins v. United States*, 598 U.S. 152, 165 (2023) (statute of limitations is non-jurisdictional). But in doing so, the Court cast no doubt on our long-standing treatment of the Act's statute of limitations' trigger as light: all that is required is constructive notice that the government holds a reasonable claim to some interest in the property. *See Spirit Lake Tribe v. North Dakota*, 262 F.3d 732, 738 (8th Cir. 2001)*, abrogated on other grounds by Wilkins*, 598 U.S. at 165; *see also North Dakota v. Block*, 789 F.2d 1308, 1312–13 (8th Cir. 1986) (same). In describing the trigger as light, we have noted that even "invalid" claims may start the limitations period and courts may not demand a high level of either clarity or claim merit when considering the issue of constructive notice:

> The 12-year limitations period begins when a plaintiff knows or should know of the government's adverse land claim. This standard does not require the government to provide explicit notice of its claim. The government's claim need not be "clear and unambiguous." "Knowledge of the claim's full contours is not required. All that is necessary is a reasonable awareness that the Government claims some interest adverse to the plaintiffs."

> Further, the government's interest "need not amount to full legal title . . . . As long as the interest claimed is a 'cloud on title,' or a reasonable claim with a substantial basis, it constitutes a 'claim' for purposes of triggering the twelve-year statute of limitations." Even invalid government claims trigger the QTA limitations period. Simply put, the

> limitations period is triggered when a landowner has reason to know that the government claims some type of adverse interest in that land.

*Spirit Lake Tribe*, 262 F.3d at 738 (citations omitted). In our view, this light trigger makes perfect sense. The Act is already somewhat generous to plaintiffs. *Id.* at 737. It reflects an express waiver of sovereign immunity and contains a lengthy 12-year limitations period. *Id.* But, because evidence may grow stale and government personnel frequently change, the light trigger cabins the risk that the United States might be hailed into court involuntarily, long after the true genesis of a land dispute.

Given this low threshold, the controlling question in the present case asks whether the 1979 judgment provided constructive notice of: (1) an ongoing "reasonable claim with a substantial basis," *id.* at 738, or (2) a sufficiently clear resolution of the centerline issue such that some additional adverse action or claim by the United States was required to start the limitations period. For several reasons, we conclude the 1979 judgment provided constructive notice of a qualifying and unresolved claim.

First, erection of the monument in the early 1970s, the presence of the Peter's Stone, and references to the stone in the 1962 plat map provide a fair degree of notice to purchasers of subdivision lots that a United States claim may arise. Second, the owners of Lots 7 and 9–11 were not parties to the prior action. Evidence cited in the 1979 judgment included anecdotal reports of discussions between Corps personnel and adjacent landowners. The evidence, therefore, was not limited merely to undisputed land records or inferences to be drawn from such records. Rather, the evidence depended on the litigation decisions and choices of the parties to the suit. The evidence very well may have differed if the other lot owners had been parties to the action.

Third, as stated above, the 1979 judgment was not entirely clear as to the boundaries of Lot 8 itself, much less the boundaries of lots owned by persons not party to the suit. The 1979 judgment awarded only a small portion of Lot 8 to the

Highfills; it did not grant the Highfills an area of land extending to a north-south line located at the Peter's Stone. And the 1979 judgment defined that small area of land using a description commencing from the Corps' monument. The United States had identified only a portion of Lot 8 in its complaint under the Act, and for whatever reason, the Highfills did not counterclaim to seek a greater remedy. If the 1979 judgment adverse to the United States did not expressly award to the actual defendants the entirety of Lot 8 (as defined by their theory of the case), it certainly did not put to rest the possibility of future claims involving other lots and the same disputed centerline.

Most importantly, none of these potential sources of notice are required to prove the existence of a winning claim for the United States. Collectively, these several sources of uncertainty regarding the scope of the 1979 judgment demonstrate that there continued to exist at least "a reasonable claim with a substantial basis." *Spirit Lake Tribe*, 262 F.3d at 738.

Regarding collateral estoppel, the district court was correct to reject the theory. The Gambrells and their predecessors-in-interest were not parties to the action resulting in the 1979 judgment. When an unrelated party later attempts to bind a prior litigant through issue preclusion, or collateral estoppel, courts refer to the attempted estoppel as "nonmutual offensive collateral estoppel." *United States v. Mendoza*, 464 U.S. 154, 157 (1984). As the Court explained in detail in *Mendoza*, nonmutual offensive collateral estoppel does not apply against the United States government for several reasons: (1) the vast amount of litigation the government conducts; (2) the policy choices inherent in choosing to begin or terminate any particular litigation; (3) the prudential considerations inherent in the solicitor general's decisions to file appeals; (4) the need for "successive Administrations of the Executive Branch to take differing positions with respect to the resolution of a particular issue" for myriad policy reasons; and (5) the need to permit the ongoing development of important areas of the law. *Id.* at 160–61. In simple terms, "the Government is not in a position identical to that of a private litigant." *Id.* at 159 (quoting *INS v. Hibi*, 414 U.S. 5, 8 (1973) (*per curiam*)). And here, it is easy to

understand the likely reason the government did not appeal the 1979 judgment. The district court ordered the transfer of a small portion of land to the Highfills, apparently a small portion of land most directly affecting a structure on the land. Prior to the 1970s litigation, the United States had offered to sell the disputed portion to the Highfills for $600. Had the court in 1979 ordered relief more broadly, the government may have appealed. Similarly, had the Highfills counterclaimed for the entirety of Lot 8, or if the owners of Lots 7 and 9–10 been voluntarily or involuntarily joined to the earlier action, the course of the litigation and the choice to appeal may have differed.

Finally, regarding the practical effect of today's ruling, the district court wisely cited language from *Block* noting that a statute of limitations ruling on a Quiet Title Act claim does not resolve the underlying real estate dispute. *See Block*, 789 F.2d at 1314 ("A [Quiet Title Act statute of limitations] dismissal . . . does not quiet title to the property in the United States. The title dispute remains unresolved. Nothing prevents the claimant from continuing to assert his title, in hope of inducing the United States to file its own quiet title suit, in which the matter would finally be put to rest on the merits." (quoting *Block v. North Dakota*, 461 U.S. 273, 291–92 (1983))). The United States thus remains free to bring a quiet title action. And the Gambrells remain free to accept the risk of acting upon their view of the boundary in an effort to get what they want, induce negotiations, or induce the United States to file suit.

We affirm the judgment of the district court.

———————————————