# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 24-1177

———————————————

McKenzie County, ND

*Plaintiff - Appellee*

v.

United States of America; Department of Interior

*Defendants - Appellants*

————————

Appeal from United States District Court
for the District of North Dakota - Western

————————

Submitted: October 23, 2024
Filed: March 20, 2025

————————

Before SHEPHERD, KELLY, and STRAS, Circuit Judges.

————————

SHEPHERD, Circuit Judge.

This case concerns mineral royalties under certain lands in McKenzie County, North Dakota. McKenzie County sued the United States, claiming those royalty interests as its own and that previous litigation settled the matter. The United States

asserts that the prior litigation involved different lands and that the County's[1] claim is untimely. The district court granted judgment for the County, and the United States appeals. Having jurisdiction under 28 U.S.C. § 1291, we reverse.

I.

Before it achieved statehood in 1889, North Dakota was part of the Dakota Territory, an organized incorporated territory of the United States. Much of the land in present-day North Dakota was then part of the public domain: "land owned by the [Federal] Government . . . that was 'available for sale, entry, and settlement under the homestead laws, or other disposition under the general body of land laws.'" See Hagen v. Utah, 510 U.S. 399, 412 (1994) (citation omitted). These lands were "in the first instance the exclusive property of the United States, to be disposed of to such persons, at such times, . . . in such modes, and by such titles, as the Government may deem most advantageous . . . ." Irvine v. Marshall, 61 U.S. (20 How.) 558, 561-62 (1857).

Beginning in the mid-nineteenth century, Congress exercised that authority "to encourage the settlement of the West." See Amoco Prod. Co. v. S. Ute Indian Tribe, 526 U.S. 865, 868 (1999). It did so by providing land "in fee simple absolute" to settlers in the Dakota Territory and the newly admitted North Dakota under various land-patent laws. See id. Some of these acts authorized patents with title to both the surface and mineral estates. Id.; see, e.g., 1862 Homestead Act, ch. 75, 12 Stat. 392 (1862). Others authorized the conveyance of title in only the surface estate, reserving the mineral interest as part of the public domain. Amoco Prod. Co., 526 U.S. at 870; Watt v. W. Nuclear, Inc., 462 U.S. 36, 38-39 (1983); see, e.g., Stock-Raising Homestead Act of 1916, ch.9, 39 Stat. 862. In both cases, the lands were "valuable for grazing [livestock] and raising forage crops." See Watt, 462 U.S. at 38 (citation omitted).

---

[1]For clarity, we refer to the plaintiff-appellee municipal entity as "the County," while we refer to the geographic location as "McKenzie County."

-2-

In the 1920's and 1930's, however, the economic bounty of these lands began to falter. A series of droughts hit North Dakota, causing widespread dust storms and crop failure. Exacerbated by the onset of the Great Depression, property values plummeted as the Dust Bowl ravaged the Great Plains. Many landowners were forced into bankruptcy, unable to afford the property taxes on their once profitable land. Like many other counties, the County foreclosed on a significant acreage of land within McKenzie County and acquired title to the property through tax forfeiture proceedings. Whatever title the previous landowner held passed to the County: only the surface estate if the United States initially reserved the minerals, or both the surface and mineral estates if the original patent included title to both.

But the dire times continued. By 1935, vast swaths of land were in such poor condition "that the operators ha[d] practically no chance of securing a decent living," and much of the land remained "submarginal" to the point of nearing "retire[ment] from cultivation." See M.L. Wilson, The Report on Land of the National Resources Board, 17 J. Farm Econ. 39, 44 (1935). Congress responded to the crisis with a series of emergency relief bills authorizing the President to acquire and restore these "submarginal" lands. See National Industrial Recovery Act, Pub. L. No. 73-67, §§ 201-03, 48 Stat. 200 (1933); Federal Emergency Relief Appropriation Acts, Pub. L. No. 74-11, 49 Stat. 115 (1935), and Pub. L. 74-739, § 689, 49 Stat. 1608 (1936). Eventually, Congress enacted the Bankhead-Jones Farm Tenant Act, which, like the earlier acts, codified the authority to "acquire by purchase, gift, or devise, or by transfer from . . . any State, Territory, or political subdivision, submarginal land and land not primarily suited for cultivation." See Pub. L. 75-210, § 32(a), 50 Stat. 522, 525-26 (1937). The Act also permitted the Secretary of Agriculture[2] to acquire these lands "subject to any reservations, outstanding estates,

_____

[2]The lands in McKenzie County were initially administered by the Secretary of Agriculture, and that authority was assigned to the United States Forest Service. See 19 Fed. Reg. 74, 75 (Jan. 6, 1954). These lands were later designated as part of the Little Missouri National Grassland, with surface administration again vested in the Forest Service. 36 C.F.R. § 213.1(b), (d), and (e). While the Department of Agriculture continues to manage the surface, see id. § 213.1, the Secretary of the

interests, easements, or other encumbrances which . . . w[ould] not interfere" with the Act's purposes. Id. § 32(a), 50 Stat. at 526. Moreover, like the earlier relief acts, the Act authorized the sale, lease, or other disposal of land acquired under the Act, but not property acquired through other means. Id. § 32(c), 50 Stat. at 526.

Using this collection of statutes and relevant executive orders, the United States sought to acquire lands from the County. To avoid the possibility of redemption by the previous landowners and to obtain clear title, the United States used the power of eminent domain. So, beginning in 1937, the United States invoked the Condemnation Act, Pub. L. 50-728, 25 Stat. 357 (codified as amended at 40 U.S.C. § 3113), and the Declaration of Taking Act, Pub. L. 71-736, 46 Stat. 1421 (codified as amended at 40 U.S.C. §§ 3114-16, 3118), and filed six declarations of taking in federal district court in North Dakota. The declarations listed the specific tracts the United States wanted—some where the County held both the surface and mineral estates (acquired lands or, when referring to the mineral estate only, acquired minerals) and others where the County held only the surface estate, as the United States had retained the mineral estate in the original patent (public domain lands or public domain minerals). See Wallis v. Pan Am. Petroleum Corp., 384 U.S. 63, 65 & n.2 (1966) ("[I]n general[,] acquired lands are those granted or sold to the United States by a State or citizen and public domain lands were usually never in state or private ownership."). The lands were listed by tract number and legal description.[3]

_____

Interior is responsible for managing the subsurface estate. See 30 U.S.C. §§ 181, 189, 226, 352; 43 U.S.C. §§ 1731-32.

[3]These legal descriptions followed the Public Land Survey System, which subdivides and describes land in 30 southern and western states—all states except the 13 original colonies, Maine, Vermont, Kentucky, Tennessee, West Virginia, Hawaii, and Texas. Under this system, land is divided into 3840-acre "Townships," which can be subdivided into 640-acre "Sections," 160-acre "quarter sections," and 40-acre "quarter-quarter sections." Individual parcels can then be labeled according to a standardized system. For example, one of the tracts now in dispute (Tract No. 277) comprises 320 acres of land in the Northeast and Southeast quarters of Section 20 of Township 147 North, Range 104 West and is labeled as: NE¼ and SE¼, Sec. 20, T147N, R104W.

Though the declarations took title to the listed lands "in full fee simple," they did so "subject . . . to the rights of [the] County . . . to a 6¼% perpetual royalty in minerals which may exist or may be developed on all of said tracts of land." In entering judgment on the declarations, the district court noted that "[a]ll the [taken] tracts or parcels of land . . . [we]re subject to a 6¼% royalty reservation" in the County, with the exception of specific tracts. The County then delivered to the United States the tax deeds for the listed tracts, though these deeds did not include the royalty reservation. Thereafter, the district court entered final judgment in each of the condemnation actions (collectively, the 1930's Condemnation Judgments), thus completing the acquisition of title.[4] Each of the 1930's Condemnation Judgments contained the "6¼% perpetual royalty" language, again excepting certain specified tracts from the reservation,[5] but making no reference to public domain or acquired lands and minerals.

Thereafter, the Bureau of Land Management (BLM) at the Department of the Interior annotated its records to reflect the County's royalty interest in tracts with acquired minerals, but not those with public domain minerals. Over the next four decades, BLM leased both acquired and public domain minerals for oil and gas development and directed the royalty from acquired lands with producing mineral leases to be paid to the County. In 1985, however, BLM informed the County that it would no longer recognize the royalty reservation in the acquired minerals based on an intervening change in state law prohibiting the County from reserving interests in lands it had acquired through tax forfeiture proceedings. See De Shaw v. McKenzie County, 114 N.W.2d. 263, 264-65 (N.D. 1962).

Understandably, the County was displeased. After unsuccessfully appealing to the Interior Board of Land Appeals, in 1987 the County sued in the United States

_____

[4]The condemnation judgments are identified by their "Action At Law" number and include, as relevant here, Nos. 1000, 1001, 1002, 1006, 1007, and 1028.

[5]Additionally, some judgments included the royalty reservation in only particular tracts as specified.

District Court for the District of North Dakota.[6]  In its complaint, the County defined the suit as "a dispute over ownership of a 6¼% royalty interest under certain lands located in McKenzie County," and referenced Enclosure 1 as the "subject lands" in the dispute.  The County also referenced each of the 1930's Condemnation Judgments, both as general background information and in listing the tracts from Enclosure 1 that were taken in each judgment.  Among other forms of relief, the County sought to "[q]uiet title in the name of [the] County, to the 6¼% royalty under the subject lands."[7]

After discovery and initial briefing, the district court certified questions of law to the North Dakota Supreme Court.  See McKenzie County v. Hodel, 467 N.W.2d 701 (N.D. 1991).  Leaving the construction of the 1930's condemnation judgments to the district court, the North Dakota Supreme Court narrowed its consideration to two issues.  Id. at 703-04.  First, it held that "North Dakota Law did not impede the transfer of title to real property by operation of a judgment" because the judgment itself "has the effect of a conveyance executed in due form of law."  Id. at 705 (citation omitted).  A transfer of real property through a judgment, then, need not comply with North Dakota's conveyancing statutes.  Id.

Second, the court held that "nothing in . . . De Shaw . . . limit[ed] the County's authority to reacquire title to property formerly held by tax title," and thus the County

<hr />

[6]This complaint named as defendants Donald Hodel (then Secretary of the Interior), Robert Burford (then National Administrator of BLM), Marv LeNoue (Area Administrator of BLM), and Cynthia L. Embretson (Chief of the Fluids Adjudication Section at BLM) in their official capacities.  The complaint did not name the United States as a defendant.  Before this Court, the parties proceed as if it were brought against the United States.

[7]Though seeking to quiet title, the County did not invoke the Quiet Title Act.  See 28 U.S.C. § 2409a.  Instead, the County relied on the district court's authority to issue mandamus relief, see 28 U.S.C. § 1361, declaratory relief, see id. § 2201, and injunctive relief, see id. § 2202, and to review final agency action, see 5 U.S.C. § 704.  The United States did not argue that the Quiet Title Act provided the exclusive means of adjudicating the dispute in that litigation.

was permitted to "repurchase, take by eminent domain, or otherwise reacquire an interest in the property" that it had previously conveyed. <u>Id.</u> Accordingly, North Dakota law, "and its interpretation in <u>DeShaw</u>, d[id] not prohibit the County from acquiring title to mineral interests through operation of a condemnation judgment." <u>Id.</u>

Back in the district court, the County moved for summary judgment based on the North Dakota Supreme Court's opinion and answers to the certified questions. After hearing opposition from the United States, the district court granted the County's motion. It held that "the recognition of a mineral reservation in the County in the [1930's Condemnation Judgments] operate[d] as a conveyance of that mineral interest to the County." The court thereby directed that judgment be entered "quieting title in the County to the disputed minerals." A week later, the court entered judgment:

> The Federal Government's condemnation actions against McKenzie County in the late 1930's extinguished all title McKenzie County had in the land, including any royalty interests. New title then vested in the Federal Government and through the condemnation judgments [the] County received the 6¼% royalty interest. The recognition of a mineral reservation in favor of McKenzie County in the federal condemnation judgments operates as a conveyance of that mineral interest to McKenzie County.

> It is ORDERED AND ADJUDGED that title to the disputed minerals (6¼% royalty) is quieted in McKenzie County; and, the Defendants are barred from any claim in regard to the same or proceeds from the same; that McKenzie County is the owner of the disputed minerals (6¼% royalty) free and clear of any claim of the above named defendants.

("1991 Judgment"). The United States did not appeal. In the years that followed, BLM updated its records to again recognize the County's royalty interest in acquired lands and directed oil and gas operators to resume paying the royalty to the County. As before, however, BLM's records never reflected a royalty interest in public domain minerals.

-7-

Despite the return to the status quo, the County soon became concerned about BLM's compliance with the 1991 Judgment. So the County initiated a project to "inventory and map all royalties the [C]ounty owns, research the statute of limitations and then file with the federal government and proceed to court if necessary." In the summer of 1998, the County authorized a search of the National Archives for the case files from the 1930's Condemnation Judgments. This inventory effort continued for several years, with the Board of County Commissioners receiving regular updates on its progress. Throughout the process, the County and its attorneys had extensive correspondence with BLM about the mineral royalties and their operation.

In November 2003, BLM sent the County a message which stated that, according to BLM's records, "only the acquired minerals in the [1930's Condemnation Judgments we]re subject to a 6¼% royalty reservation[]." Two weeks later, in a meeting on December 2, the Board of County Commissioners noted "that BLM may not be recognizing the [C]ounty's royalty right on parcels which were originally patented with mineral reservations to the federal government." In the County's view, the 1930's Condemnation Judgments "supersede[d] those reservations." After meeting with BLM officials later that month to address the issue, the County received a letter from BLM on January 27, 2004. Along with a list of specific tracts, the letter included three relevant statements: that BLM recognized a royalty interest in only about three-quarters of the lands the County identified; that the discrepancy was "because [the County's] records included lands with Public Domain minerals"; and that "[o]nly lands acquired by the United States in the condemnations are subject to a 6¼ percent royalty reservation."

On January 11, 2016, the County sued the United States under the Quiet Title Act, 28 U.S.C. § 2409a, seeking to quiet title to the royalty interest in public domain minerals, listing specific tracts of land in its complaint. After the County filed an amended complaint, the United States moved to dismiss, arguing that the County's claim was untimely under the Quiet Title Act's 12-year statute of limitations. See 28 U.S.C. § 2409a(g). The district court denied the motion and granted the County

-8-

leave to file a second amended complaint. In the district court's view, the 1991 Judgment already quieted title to the public domain minerals for the County, and thus the Quiet Title Act's limitations period might not be relevant.

The County then filed its second amended complaint ("2019 Complaint"), which included an additional claim for relief.[8] Invoking the All Writs Act and Federal Rule of Civil Procedure 70(c), the County sought to enforce the 1991 Judgment or the 1930's Condemnation Judgments which, in its view, included the royalty interest underlying the tracts it was now disputing. The United States again moved to dismiss, claiming that the County failed to plausibly allege a right to relief under the All Writs Act and reasserting its statute-of-limitations argument under the Quiet Title Act. The district court denied that motion as well, concluding that the County had pled facts sufficient to survive a motion to dismiss and reiterating its decision on the statute of limitations.

Both parties moved for summary judgment. Rejecting the United States' argument that the County could not circumvent the Quiet Title Act, the district court held that the All Writs Act and Rule 70 empowered it to enforce its orders from both the 1991 Judgment and the 1930's Condemnation Judgments. The district court then concluded that the 1930's Condemnation Judgments clearly and unambiguously included the royalty interest in all lands listed, whether public domain or acquired, and that the 1991 Judgment plainly and unambiguously quieted title to the royalty interests in tracts listed in the 2019 Complaint. In the alternative, the district court held that the County's Quiet Title Act claim was not barred by the Act's statute of limitations and further, were it to address the issue in the first instance, it would quiet title to the public domain mineral royalty in the County. The district court thus denied the United States' motion for summary judgment, granted the County's motion for summary judgment, and entered judgment in favor of the County. It issued the County's requested writ of mandamus, along with a declaration that the royalty interest applies to both public domain and acquired minerals, and directed

---

[8]The County also added the Department of the Interior as a defendant.

the United States to comply with that declaration as embodied in the 1930's Condemnation Judgments and 1991 Judgment.

The United States appeals, arguing that the County must proceed, if at all, under the Quiet Title Act because the All Writs Act does not provide a remedy; that the County's Quiet Title Act claim is untimely; and that, even assuming timeliness, the 1930's Condemnation Judgments did not convey a royalty interest to the County in public domain minerals.

II.

The United States first challenges the district court's grant of judgment under the All Writs Act. We review the grant of summary judgment de novo, affirming "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (citation omitted).[9]

The All Writs Act grants "[t]he Supreme Court and all courts established by Act of Congress [the authority to] issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). The Act thus "authorizes a federal court 'to issue such commands . . . as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained.'" Syngenta Crop Prot., Inc. v. Henson, 537 U.S. 28, 32 (2002) (quoting United States v. N.Y. Tel. Co., 434 U.S. 159, 172 (1977)).

But this authority is not without limits. For one thing, the Act "is not an independent source of subject matter jurisdiction." Ark. Blue Cross & Blue Shield

_____

[9]The facts of this case are not in dispute. The only question is whether the County or the United States was entitled to judgment as a matter of law.

v. Little Rock Cardiology Clinic, P.A., 551 F.3d 812, 821 (8th Cir. 2009). "[W]hile the All Writs Act empowers federal courts to wield certain 'procedural tools,' such as the 'various historic common-law writs,'" id. at 820 (citation omitted), such tools are available "only to the extent that 'the issuance of process [is] "in aid of" the issuing court's jurisdiction,'" id. (alteration in original) (quoting Clinton v. Goldsmith, 526 U.S. 529, 534 (1999)). For another, the All Writs Act is not a mechanism for "circumvent[ing] statutory requirements or otherwise binding procedural rules." Shoop v. Twyford, 596 U.S. 811, 820 (2022). The All Writs Act cannot provide relief "[w]here a statute specifically addresses the particular issue at hand." Syngenta, 537 U.S. at 32 (alteration in original) (quoting Pa. Bureau of Corr. v. U.S. Marshals Serv., 474 U.S. 34, 43 (1985)). The United States invokes this latter limitation here. According to the United States, the Quiet Title Act precludes All Writs Act relief when a plaintiff merely seeks to quiet title against the United States.

As a general matter, the United States is correct. The Quiet Title Act contains a limited waiver of sovereign immunity for civil actions against the United States "to adjudicate a disputed title to real property in which the United States claims an interest." 28 U.S.C. § 2409a(a). By its terms, the Quiet Title Act "specifically addresses" disputes with the United States over title to real property. See Syngenta, 537 U.S. at 32 (citation omitted). Because the Quiet Title Act provides the means for adjudicating those disputes, the All Writs Act "cannot [be] use[d] . . . to circumvent [the Quiet Title Act's] statutory requirements [and] otherwise binding procedural rules." See Shoop, 596 U.S. at 820.

The nature of the Quiet Title Act makes this point particularly clear. The Quiet Title Act is not just "a statute [that] specifically addresses" title disputes with the United States, see Syngenta, 537 U.S. at 32; it is the *only* such statute. The Quiet Title Act "provide[s] the exclusive means by which adverse claimants c[an] challenge the United States' title to real property." Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands (Block I), 461 U.S. 273, 286 (1983). Parties cannot use other statutes or rules "to end-run the [Quiet Title Act]'s limitations." Match-E-Be-

-11-

Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. 209, 216 (2012). Thus, if a plaintiff "not only challenges [the United States'] claim [to property], but also asserts his own right" to that property, he must do so subject to the Quiet Title Act's strictures. See id. at 217. This is true regardless of how the claim is labeled. See, e.g., Block I, 461 U.S. at 277-78, 286, n.22 (prohibiting suits brought under Declaratory Judgment Act and Administrative Procedure Act (APA)); United States v. Mottaz, 476 U.S. 834, 846-49 (1986) (prohibiting suits under General Allotment Act, 25 U.S.C. § 345); cf. Patchak, 567 U.S. at 220-24 (permitting APA claims when party does not assert personal property interest adverse to that of the United States).

On its face, then, the County's claim under the All Writs Act is no different. The County asserts a royalty interest in certain minerals that conflicts with the interest claimed by the United States. The Quiet Title Act provides a remedy for this dispute, and its remedy is exclusive of all others. See Mottaz, 476 U.S. at 846-48. By the United States' logic, the County thus cannot "avoid [the Quiet Title] Act's strictures" by resorting to the All Writs Act. See id. at 847. In the district court and on appeal, the County suggests two ways the All Writs Act can be used in this case: through enforcing the 1930's Condemnation Judgments or through enforcing the 1991 Judgment. For different reasons, neither option provides the County the relief it seeks.

A.

The County argues that the All Writs Act can be invoked to enforce the terms of a prior judgment that itself quieted title, claiming that the 1991 Judgment did so for the minerals at issue in this litigation. But such relief could be available only if the 1991 Judgment included the tracts of land now in dispute.[10] In other words, the

---

[10]Though we ultimately conclude that 1991 Judgment does not include the tracts at issue here, we do not doubt that a district court can enforce a Quiet Title Act judgment, either under Rule 70 or the All Writs Act. See Ohio Oil Co. v. Thompson, 120 F.2d 831, 837 (8th Cir. 1941) (noting "the general rule that when a plaintiff seeks to quiet title," he may request judgment "for a writ of possession" to require

All Writs Act only provides a mechanism for the County to the extent the 1991 Judgment addressed the tracts in the 2019 Complaint. We must therefore determine the scope of the 1991 Judgment.

The parties have provided no authority from this Circuit—and we are aware of none—where we reviewed a district court's interpretation of a prior order or final judgment, nor is there a clear statement of the standard of review. That being said, other courts addressing similar issues have held that "[t]he interpretation of the text of a court order or judgment is considered a conclusion of law subject to de novo review." United States v. Spallone, 399 F.3d 415, 423 (2d Cir. 2005). We adopt that standard here.[11] See id.; see also United States v. 60.22 Acres of Land, More or Less, Situate in Klickitat Cnty., 638 F.2d 1176, 1178 (9th Cir. 1980) (reversing district court's interpretation of a condemnation judgment); SEC v. Hermil, Inc., 838 F.2d 1151, 1153-54 (11th Cir. 1988) (reversing district court's interpretation of

title to be passed in accordance with the underlying judgment); Peacock v. Thomas, 516 U.S. 349, 356 (1996) (recognizing a court's "inherent power to enforce its judgments").

[11]We have previously endorsed a more deferential standard for reviewing a bankruptcy court's interpretation of a Chapter 11 plan, see In re Dial Bus. Forms, Inc., 341 F.3d 738, 744 (8th Cir. 2003) (reviewing for an abuse of discretion), and for reviewing a district court's interpretation of its mandate on remand to an Administrative Law Judge, see Steahr v. Apfel, 151 F.3d 1124, 1126 (8th Cir. 1998) ("defer[ring] to the district court's interpretation"). We did so in part because we were reviewing "a court's interpretation of its own order," In re Dial Bus. Forms, 341 F.3d at 744 (citation omitted), and thus the district court was "best able to determine whether its [order] ha[d] been violated." Steahr, 151 F.3d at 1126. The temporal proximity justifying that deference is not present here, nor is the district judge who issued the order later interpreting it. Instead, this situation is more like interpreting a consent decree, where we apply de novo review, though we accord deference when the court that entered the decree and the court tasked with interpreting it are one and the same. See United States v. City of Fort Smith, 48 F.4th 900, 907 (8th Cir. 2022). Because that is not the case here, we do not accord that deference. See also Spallone, 399 F.3d at 423 (noting that issuing judge's "construction of an ambiguity in his own words" is reviewed for abuse of discretion).

unambiguous final judgment). In doing so, "[i]t is our responsibility to construe a judgment so as to give effect to the intention of the court, not to that of the parties." 60.22 Acres of Land, 638 F.2d at 1178.[12]

In relevant part, the 1991 Judgment reads as follows:

> The Federal Government's condemnation actions against McKenzie County in the late 1930's extinguished all title McKenzie County had in the land, including any royalty interests. New title then vested in the Federal Government and through the condemnation judgments McKenzie County received the 6¼% royalty interest. The recognition of a mineral reservation in favor of McKenzie County in the federal condemnation judgments operates as a conveyance of that mineral interest to McKenzie County.
>
> It is ORDERED AND ADJUDGED that title to the disputed minerals (6¼% royalty) is quieted in McKenzie County; and, the Defendants are barred from any claim in regard to the same or proceeds from the same; that McKenzie County is the owner of the disputed minerals (6¼% royalty) free and clear of any claim of the above named defendants.

R. Doc. 20-8, at 3. As the district court noted, the question is whether "disputed minerals (6¼% royalty)" covers the lands and mineral rights at issue in this appeal.

When "a 'judgment is clear and unambiguous,' a court must 'adopt, and give effect to,'" its plain meaning. Spallone, 399 F.3d at 421 (citation omitted); see also Travelers Indem. Co. v. Bailey, 557 U.S. 137, 150 (2009) ("[W]here the plain terms of a court order unambiguously apply, . . . they are entitled to their effect."). But the meaning of the 1991 Judgment is not so obvious. Though the order refers to the

---

[12]This makes our analysis slightly different than in the consent-decree context, where we "look to rules of contract interpretation" to "discern the *parties*' intent" because "the content of a consent decree is generally a product of negotiations between the parties." See City of Fort Smith, 48 F.4th at 907 (emphasis added) (citations omitted). To state the obvious, the 1991 Judgment was not the result of a collaborative effort in any sense of the word.

-14-

1930's Condemnation Judgments and "the disputed minerals (6¼% royalty)," it does not reference specific tracts of land, public domain or acquired minerals, or even specific condemnation actions. Nor is there any clarifying language elsewhere in the memorandum decision, as the court referred only to "the 6¼% royalty" or "large tracts of land" that were "'subject to' a 6¼% royalty." The court's reference to "disputed minerals" necessarily raises the question of what minerals were in dispute. The County argues that the court defined the term as the "6¼% royalty," but that leaves us in the same place: which minerals under which tracts? Thus, the plain text of the 1991 Judgment does not "unambiguously apply" to the public domain minerals at issue here, cf. Travelers Indem., 557 U.S. at 151.

Because the scope of 1991 Judgment is unclear from its plain terms, we may resort to "the entire record before the issuing court" to determine what was decided. See Ruiz v. Snohomish Cnty. Pub. Util. Dist. No. 1, 824 F.3d 1161, 1167 (9th Cir. 2016) (citation omitted); see also City of Fort Smith, 48 F.4th at 907 ("[W]hen interpreting the meaning of a consent decree 'as written,' we are not to ignore the context in which the parties were operating, nor the circumstances surrounding the order." (citation omitted)). We must interpret the order "with reference to the issues it was meant to decide," see Mayor & Aldermen of Vicksburg v. Henson, 231 U.S. 259, 269 (1913), so we must not construe it "as going beyond the motion in pursuance of which the order was made, for a court is presumed not to intend to grant relief which was not demanded," see Spallone, 399 F.3d at 424 (citation omitted). See also Henson 231 U.S. at 269 ("Every decree in a suit in equity must be considered in connection with the pleadings, and . . . it will be limited by construction so that its effect shall be such, and such only, as is needed for the purposes of the case that has been made and the issues that have been decided." (citation omitted)).

Applying those principles here, we conclude that the 1991 Judgment does not include the tracts listed in the 2019 Complaint and at issue in this case. There are several clues that indicate as much. Start with the language of the County's complaint from that case. See id. at 269 (noting that scope of an order "must be

-15-

considered in connection with the pleadings" (citation omitted)). In the second paragraph, the County defined the litigation as "a dispute over ownership of a 6¼% royalty interest under certain lands located in McKenzie County." The County said the lands were those "described in Enclosure 1," and defined them as the "subject lands." In its own words, then, the County limited its claim to the minerals underlying the tracts listed in Enclosure 1.

The County doubled down on this limitation a few pages later. It described the 1930's Condemnation Judgments by referencing each of the actions at law through which the United States obtained lands in McKenzie County. But in doing so, the County explicitly listed specific tracts—the same ones from Enclosure 1 and not a single tract more. None of those tracts contains public domain minerals, and none of those tracts is part of the lawsuit now before us. As "master of the complaint," it was up to the County to decide which tracts were included, and it only included those listed in Enclosure 1. See Johnson v. MFA Petroleum Co., 701 F.3d 243, 247 (8th Cir. 2012); see also The Fair v. Kohler Die & Specialty Co., 228 U.S. 22, 25 (1913) ("Of course, the party who brings a suit is master to decide what law he will rely upon."). If the County wanted the litigation to cover other tracts, it should have listed them. Cf. Hunter v. Page County, 102 F.4th 853, 869 (8th Cir. 2024) ("If [plaintiffs] did not want to risk removal of their case to federal court, they should not have pleaded a federal claim.").

That the County did not list any other tracts is compelling evidence that the 1991 Judgment does not extend beyond those listed in Enclosure 1, particularly given the strict pleading requirements for quiet title actions against the United States—requirements the County was capable of fulfilling in the instant case. See 28 U.S.C. § 2409a(d) (requiring plaintiffs to describe "with particularity the nature of the right, title, or interest which the plaintiff claims in the real property, the circumstances under which it was acquired, and the right, title, or interest claimed by the United States"). Just as the instant litigation is limited to the tracts particularly described in the 2019 Complaint, the 1991 Judgment is limited to those tracts the County chose to include in its lawsuit, nothing more.

-16-

The County's requested relief further confirms the 1991 Judgment's scope. The County first requested a preliminary injunction preventing further claims to the royalty "under the subject lands." Similarly, it asked the court to "[q]uiet title" to the royalty interest "under the subject lands." With its request for relief tailored to specific tracts, it is hard to see how the judgment granting that relief would not be so limited. To be sure, it elsewhere used only the phrase "the 6¼% royalty"—when asking for reimbursement and when seeking declaratory relief and a permanent injunction. But each of those references contained no other limiting language and immediately followed the specific requests tied to the "subject lands." Because "a court is presumed not to intend to grant relief which was not demanded," Spallone, 399 F.3d at 424 (citation omitted), we do not think the court could have intended the 1991 Judgment to extend to lands not listed in Enclosure 1. See also Ford Motor Co. v. Summit Motor Prods., Inc., 930 F.2d 277, 286 (3d Cir. 1991) (noting that orders must be construed to "give effect to the intention of the court." (citation omitted)).

This conclusion is supported by other portions of the record. For example, the County's memorandum in support of its renewed motion for summary judgment referenced the "subject lands" throughout, describing differences among the "subject lands" and including a list of the tracts taken in each of the 1930's Condemnation Judgments—the same tracts from the complaint. That the County itself continued to refer to the "subject lands" is just further evidence the 1991 Judgment was not meant to address anything beyond that. See Spallone, 399 F.3d at 424 (noting that orders must not be construed "as going beyond the motion in pursuance of which the order was made" (citation omitted)). Each of these facts alone would be persuasive evidence of the judgment's scope. Taken together, they compel our conclusion that the 1991 Judgment was limited to only the tracts listed in Enclosure 1.

The County's responses are unconvincing. It argues that the plain terms of the 1991 Judgment include the tracts specifically listed in the 2019 Complaint. As already discussed, the plain terms do nothing to clarify the judgment's scope. It asserts that the dispute was defined as one "over ownership of a 6¼% royalty

interest," without limiting the argument to specific tracts of land or minerals. What the County conveniently omits, however, is the rest of the sentence: "under certain lands" that are "described in Enclosure 1" and referred to as "subject lands." Finally, the County argues that its reference to the 1930's Condemnation Judgments was sufficient to incorporate all of the tracts taken in those actions, not just the ones listed in Enclosure 1. This argument is as implausible as it is factually inaccurate. The County did not incorporate the 1930's Condemnation Judgments wholesale in its 1987 complaint; it listed, with particularity, specific tracts from Enclosure 1 that were taken in each individual condemnation judgment. Moreover, it would require suspension of disbelief to think that the County incorporated every tract from the 1930's Condemnation Judgment by specifically listing only a select few. Both individually and collectively, these arguments are unconvincing. It is clear from the record that the judgment does not cover tracts that were neither listed nor discussed.

The All Writs Act could only provide relief to the extent the 1991 Judgment included the royalties from tracts now in dispute. Based on the order's terms and the record upon which it was based, we conclude that the judgment was limited to the tracts listed in Enclosure 1. Because none of those tracts are included in the 2019 Complaint now before us, the All Writs Act cannot provide the relief the County seeks by enforcing the 1991 Judgment.[13]

B.

Alternatively, the County argues that the All Writs Act can be used to enforce the 1930's Condemnation Judgments directly, even without an intervening quiet title judgment. We have never addressed whether a plaintiff can enforce or challenge the scope of a prior condemnation judgment through something other than a quiet title

---

[13]For that same reason, the County cannot rely on Federal Rule of Civil Procedure 70. That rule grants courts certain procedural tools to enforce judgments for specific acts. See Fed. R. Civ. P. 70. Because the 1991 Judgment does not include the tracts from the 2019 Complaint, Rule 70 could not afford the County's requested relief either.

-18-

action, but the Circuits that have considered the argument appear to be uniform in their rejection of it. <u>See, e.g.</u>, <u>Klugh v. United States</u>, 818 F.2d 294, 297-98 (4th Cir. 1987) (prohibiting use of Rule 60(b) to contest original condemnation action); <u>see also</u> <u>Bank One Tex. v. United States</u>, 157 F.3d 397, 401 (5th Cir. 1998) (noting that contests over title to condemned property must be asserted "via an independent action against the United States" (citation omitted)), <u>abrogated on other grounds by</u> <u>Wilkins v. United States</u>, 598 U.S. 152, 156 & n.2 (2023). We join those courts today and reject the County's argument.

The reason we do so is because of the nature of eminent domain proceedings. A condemnation action "proceeds in rem against the property itself" and thereby "'extinguishes all previous rights,' and gives the United States title to the entire condemned property 'good against the world.'" <u>Cadorette v. United States</u>, 988 F.2d 215, 222-23 (1st Cir. 1993) (Breyer, C.J.) (citations omitted); <u>see also</u> <u>United States v. Carmack</u>, 329 U.S. 230, 235 n.2 (1946). The condemnation judgment creates title; it does not settle disputes over that title's scope. <u>See</u> <u>Cadorette</u>, 988 F.2d at 222-23. With that understanding, challenges to the scope or validity of a condemnation judgment are like any other claim contesting the scope or validity of title in any other legal instrument. Those types of challenges are properly brought under the Quiet Title Act. <u>See</u> <u>Patterson v. Buffalo Nat'l River</u>, 76 F.3d 221, 224 (8th Cir. 1996) (addressing Quiet Title Act suit challenging scope of easements in a deed); <u>see also</u> <u>Block I</u>, 461 U.S. at 277, 285-86 (holding Quiet Title Act is the exclusive remedy in suit challenging scope of property taken under the equal footing doctrine). A challenge to a condemnation judgment is no different. <u>See</u> Fed. R. Civ. P. 70(b) (noting that "judgment divesting any party's title and vesting it in others" operates as "a legally executed conveyance").

When looking to our precedent, this outcome makes sense. We have previously permitted challenges to the scope of land taken in a prior condemnation action to proceed under the Quiet Title Act. In <u>United States v. Herring</u>, we held that a plaintiff could invoke the Quiet Title Act to ascertain "the validity or substance of the title" acquired through eminent domain. 750 F.2d 669, 670-71 (8th Cir. 1984);

-19-

see Herring v. United States, 781 F.2d 119, 121 (8th Cir. 1986) (recounting that "the Quiet Title Act can be invoked to collaterally attack the government's title acquired through condemnation under the Declaration of Taking Act"). We have applied that rule in the years since, entertaining suits by plaintiffs arguing that previous condemnation proceedings "never t[ook]" property in dispute. See Long v. Area Manager, Bureau of Reclamation, 236 F.3d 910, 913 (8th Cir. 2001) (addressing dispute over scope of land taken in prior condemnation action); Bear v. United States, 810 F.2d 153, 154 (8th Cir. 1987) (entertaining quiet title action over lands acquired by United States through condemnation proceedings).

Because the Quiet Title Act can address these claims, *only* the Quiet Title Act can do so. See Block I, 461 U.S. at 273; see also Patchak, 567 U.S. at 216 (noting that where Quiet Title Act provides a remedy, that remedy is exclusive of all others). And because the Quiet Title Act "specifically addresses the particular issue," the All Writs Act cannot provide a mechanism for relief. See Pa. Bureau of Corr., 474 U.S. at 43. Accordingly, the All Writs Act cannot be used to ascertain the validity or scope of title taken in condemnation proceedings, and such claims must be brought under the Quiet Title Act. To hold otherwise would permit plaintiffs to avoid the Quiet Title Act's "carefully-crafted" remedial scheme through artful pleading, something Congress could not have intended. See Block I, 461 U.S. at 284-85.

Because the All Writs Act cannot be used to challenge the scope of the 1930's Condemnation Judgments, and because the 1991 Judgment does not include the mineral royalties at issue in this case, the district court erred in granting summary judgment for the County under the All Writs Act. The United States was entitled to judgment as a matter of law on that claim. The County must proceed, if at all, under the Quiet Title Act and subject to the Quiet Title Act's requirements.

III.

The United States invokes one of those requirements here, arguing that the County's claim is barred by the Quiet Title Act's statute of limitations. Claims under the Act are barred unless they are brought "within twelve years of the date upon which [they] accrued"—when the plaintiff "knew or should have known of the claim of the United States." 28 U.S.C. § 2409a(g). As an alternative to its All Writs Act holding, the district court granted the County relief under the Quiet Title Act and rejected the United States' argument that the claim was untimely. "We review de novo whether a statute of limitations bars a party's claim." Humphrey v. Eureka Gardens Pub. Facility Bd., 891 F.3d 1079, 1081 (8th Cir. 2018) (citation omitted). Because the County commenced its lawsuit on January 11, 2016, its claim is time barred if it "knew or should have known" of the United States' claim on or before January 10, 2004.

The Quiet Title Act contains a limited waiver of sovereign immunity, so its 12-year statute of limitations must be strictly construed. Spirit Lake Tribe v. North Dakota, 262 F.3d 732, 745 (8th Cir. 2001), abrogated on other grounds by Wilkins, 598 U.S. at 165.[14] The Quiet Title Act does not require actual notice of the United States' adverse claim. Id. at 738. Rather, "the [Quiet Title] Act's statute of limitations' trigger [i]s light." Gambrell, 111 F.4th at 875. "Knowledge of the claim's full contours is not required," North Dakota ex rel. Bd. of Univ. & Sch. Lands v. Block (Block II), 789 F.2d 1308, 1313 (8th Cir. 1986) (citation omitted), nor must the United States' claim have merit, North Dakota ex rel. Wrigley v. United States, 31 F.4th 1032, 1038 (8th Cir. 2022). Instead, the limitations period begins to run once the plaintiff has "a reasonable awareness" that the United States claims *some* adverse interest. Spirit Lake Tribe, 262 F.3d at 738 (citation omitted). That

---

[14]Wilkins held that the Quiet Title Act's statute of limitations was not a jurisdictional bar. See 598 U.S. at 165. The law governing when the limitations period accrues, however, remains valid. See Gambrell v. United States, 111 F.4th 870, 875 (8th Cir. 2024).

awareness need not be tract-specific so long as the United States' claim is based on "single legal theory." See Wrigley, 31 F.4th at 1041-42 (citation omitted).

The United States argues that the County knew or should have known about the United States' claim to public domain minerals at multiple points before January 11, 2004. One date stands out in particular: November 17, 2003.[15] On that date, BLM informed the County that "only the acquired minerals [in the 1930's Condemnation Judgments we]re subject to a 6¼% royalty reservation[]." In the United States' view, this was an explicit statement that the United States did not recognize a royalty interest in at least some lands and thus provided notice sufficient to trigger the limitations period. See Spirit Lake Tribe, 262 F.3d at 738 (noting that a plaintiff need only know "that the Government claims some interest").

The County responds that the message was vague, ambiguous, and could not have put the County on notice of the United States' claim. The County first asserts that non-possessory claims like mineral royalties are only adverse when the interest interferes with the plaintiff's rights, so the County could not have known that the United States claimed an adverse interest without more information. See Wrigley, 31 F.4th at 1039. It is true that the limitations period will not begin running until a plaintiff knows or should know of an adverse government claim, so a non-possessory interest might accrue later than a possessory one. See Kane County v. United States, 772 F.3d 1205, 1216 (10th Cir. 2014) (noting that easements can "peaceably coexist" with servient estates (citation omitted)), abrogated on other grounds by Wilkins, 598 U.S. at 165. But that does not mean the County could *never* be on notice of the adverse claim without the United States declaring that it did not recognize the royalty

---

[15]The United States further argues that (1) the 1930's Condemnation Judgments themselves; (2) the failure to receive royalty payments from public-domain minerals at any point since then; (3) a 1981 letter from BLM to the County; (4) the 1985 BLM decision based on De Shaw; and (5) the County's investigation in 1998 triggered the limitations period. Because we hold that the County's claim accrued no later than December 2003, we do not reach these alternative triggering events.

in specific tracts. Rather, the County still knew or should have known of some adverse non-possessory claim based on the notice that the United States did not recognize the royalty interest. See also Wrigley, 31 F.4th at 1039 (public notices sufficient to place state on notice of adverse non-possessory interest); 28 U.S.C. § 2409a(k)(1) (outlining accrual for claims by a state through public communications). The fact that the message did not specifically list which tracts the United States claimed is of no matter, as tract-by-tract notice is not required. See Block II, 789 F.2d at 1313-14.

The County also claims that the acquired-public domain distinction was not clear from the message—a distinction the district court thought was merely an after-the-fact fabrication by BLM to justify its position—and thus the use of the terms could not provide sufficient notice of anything. This argument falls short for multiple reasons. First, contrary to the County's suggestions, there is an established distinction between acquired and public lands. See, e.g., Murray v. United States, 291 F.2d 161, 162 (8th Cir. 1961) ("Acquired land is Government owned land acquired from private ownership. Public land is Government owned land which was part of the original public domain." (citation omitted)). Nor are these terms merely creatures of judicial decision making. Congress explicitly codified the distinction well before the County's dispute with the United States arose. See Wallis, 384 U.S. at 65 (noting the distinction and comparing the Mineral Leasing Act of 1920, Pub L. 66-146, 41 Stat. 437 (codified as amended at 30 U.S.C. § 181 et seq.), with the Mineral Leasing Act for Acquired Lands of 1947, Pub. L. 80-382, 61 Stat. 913 (codified as amended at 30 U.S.C. §§ 351-60)). The fact that BLM only used one of these terms of art in the message does not mean that the distinction was fabricated.

The County's reaction to the message also demonstrates it understood the distinction. Board meeting minutes from December 2003 show that the County was "concern[ed] that BLM may not be recognizing the [C]ounty's royalty right on parcels which were originally patented with mineral reservations to the federal government." This goes beyond whether the County should have known of the United States' claim to the royalty interest, as the County actually expressed concern

about it.  The County knew of the United States' adverse claim, thus triggering the limitations period.  See 28 U.S.C. § 2409a(g).  The County argues that the meeting minutes only show that the County was concerned about the problem, but it had no information about which tracts had producing leases and whether BLM was withholding any royalty payments.  This misunderstands the Quiet Title Act's accrual rule.  The United States' "claim need not be 'clear and unambiguous'" or asserted together with "explicit notice."  Spirit Lake Tribe, 262 F.3d at 738 (quoting Block II, 789 F.2d at 1313).  The question is not whether BLM provided such notice, but whether the County knew or should have known of the claim's general contours.  See Gambrell, 111 F.4th at 875 ("[A]ll that is required is constructive notice that the [G]overnment holds a reasonable claim to some interest in the property.").  The December 2003 meeting minutes demonstrate that the County had that notice here.

Finally, the County asserts that our decision in Patterson v. Buffalo National River means the limitations period is not triggered when a claim is vague or disputed.  Patterson involved competing interpretations of language in the original deed.  76 F.3d at 224.  In addition to a plot of land, the deed conveyed to the United States an interest in "any means of ingress or egress."  Id. at 223.  The United States interpreted the phrase to include a "primitive" road accessing ungranted property, while the grantors felt it applied only to paths to the granted property.  Id. at 223-24.  Because the language was "too ambiguous to place the [grantors] on notice of the Government's claims"—in large part because Arkansas law supported the grantor's interpretation—the limitations period could not have begun by the issuance of the deed itself.  Id.

That situation stands in stark contrast to the one here.  BLM made its interpretation of the 1930's Condemnation Judgments known.  More fundamentally, the County actually understood what the United States meant: the United States was not recognizing a royalty interest "on parcels which were originally patented with mineral reservations to the federal government."  That the County did not know which tracts had producing leases or which royalty interests the United States claimed does not affect the analysis.  "Knowledge of the claim's full contours is not

required," <u>Block II</u>, 789 F.2d at 1313 (citation omitted), nor is notice of the specific tracts or royalties, <u>Wrigley</u>, 31 F.4th at 1041-42. All that was needed was "a reasonable awareness that the Government claims some [adverse] interest." <u>Block II</u>, 789 F.2d at 1313 (citation omitted). The County had that awareness here.

At the latest, the County knew the United States did not recognize outstanding mineral royalties in lands in which the mineral estate was reserved to the United States in the original patent by December 2, 2003. It had a "generous" twelve years from that date to figure out which specific tracts were disputed and bring its claim. <u>See</u> <u>Gambrell</u>, 111 F.4th at 875. The County's failure to do so is fatal. The County's Quiet Title Act claim is untimely, and the district court erred in holding otherwise. Accordingly, the district court erred in entering judgment in favor of the County, and its judgment must be reversed.

## IV.

For these reasons, the judgment of the district court is reversed, and we remand this case to the district court with instructions to enter judgment in favor of the United States consistent with this opinion.

_____